# COLAUTTI, SECRETARY OF WELFARE OF PENNSYLVANIA, ET AL. *v.* FRANKLIN ET AL.

No. 77–891.   Argued October 3, 1978—Decided January 9, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, POWELL, and STEVENS, JJ., joined. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post,* p. 401.

*Carol Los Mansmann,* Special Assistant Attorney General of Pennsylvania, argued the cause for appellants. With her on the brief was *J. Jerome Mansmann,* Special Assistant Attorney General.

*Roland Morris* argued the cause and filed a brief for appellees.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

At issue here is the constitutionality of subsection (a) of § 5 [1] of the Pennsylvania Abortion Control Act, 1974 Pa. Laws,

---

*Burt Neuborne* and *Sylvia Law* filed a brief for the American Public Health Assn. et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *George E. Reed* and *Patrick F. Geary* for the United States Catholic Conference; and by *Dennis J. Horan, John D. Gorby, Victor G. Rosenblum,* and *Dolores V. Horan* for Americans United for Life, Inc.

[1] Section 5 reads in pertinent part:

"(a) Every person who performs or induces an abortion shall prior thereto have made a determination based on his experience, judgment or professional competence that the fetus is not viable, and if the determination is that the fetus is viable or if there is sufficient reason to believe that the fetus may be viable, shall exercise that degree of professional

Act No. 209, Pa. Stat. Ann., Tit. 35, § 6605 (a) (Purdon 1977). This statute subjects a physician who performs an abortion to potential criminal liability if he fails to utilize a statutorily prescribed technique when the fetus "is viable" or when there is "sufficient reason to believe that the fetus may be viable." A three-judge Federal District Court [2] declared § 5 (a) unconstitutionally vague and overbroad and enjoined its enforcement. App. 239a–244a. Pursuant to 28 U. S. C. § 1253, we noted probable jurisdiction *sub nom. Beal* v. *Franklin,* 435 U. S. 913 (1978).

## I

The Abortion Control Act was passed by the Pennsylvania Legislature, over the Governor's veto, in the year following this Court's decisions in *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973). It was a comprehensive statute.

Section 1 gave the Act its title. Section 2 defined, among other terms, "informed consent" and "viable." The latter was specified to mean "the capability of a fetus to live outside the

---

skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted and the abortion technique employed shall be that which would provide the best opportunity for the fetus to be aborted alive so long as a different technique would not be necessary in order to preserve the life or health of the mother.

. . . . .

"(d) Any person who fails to make the determination provided for in subsection (a) of this section, or who fails to exercise the degree of professional skill, care and diligence or to provide the abortion technique as provided for in subsection (a) of this section . . . shall be subject to such civil or criminal liability as would pertain to him had the fetus been a child who was intended to be born and not aborted."

[2] The three-judge court was designated in September 1974 pursuant to 28 U. S. C. § 2281 (1970 ed.). This statute was repealed by Pub. L. 94–381, § 1, 90 Stat. 1119, but the repeal did not apply to any action commenced on or before August 12, 1976. § 7.

mother's womb albeit with artificial aid." See *Roe* v. *Wade,* 410 U. S., at 160.

Section 3 (a) proscribed the performance of an abortion "upon any person in the absence of informed consent thereto by such person." Section 3 (b)(i) prohibited the performance of an abortion in the absence of the written consent of the woman's spouse, provided that the spouse could be located and notified, and the abortion was not certified by a licensed physician "to be necessary in order to preserve the life or health of the mother." Section 3 (b)(ii), applicable if the woman was unmarried and under the age of 18, forbade the performance of an abortion in the absence of the written consent of "one parent or person in loco parentis" of the woman, unless the abortion was certified by a licensed physician "as necessary in order to preserve the life of the mother." Section 3 (e) provided that whoever performed an abortion without such consent was guilty of a misdemeanor of the first degree.

Section 4 provided that whoever, intentionally and willfully, took the life of a premature infant aborted alive, was guilty of murder of the second degree. Section 5 (a), set forth in n. 1, *supra,* provided that if the fetus was determined to be viable, or if there was sufficient reason to believe that the fetus might be viable, the person performing the abortion was required to exercise the same care to preserve the life and health of the fetus as would be required in the case of a fetus intended to be born alive, and was required to adopt the abortion technique providing the best opportunity for the fetus to be aborted alive, so long as a different technique was not necessary in order to preserve the life or health of the mother. Section 5 (d), also set forth in n. 1, imposed a penal sanction for a violation of § 5 (a).

Section 6 specified abortion controls. It prohibited abortion during the stage of pregnancy subsequent to viability, except where necessary, in the judgment of a licensed physician, to preserve the life or health of the mother. No abortion

was to be performed except by a licensed physician and in an approved facility. It required that appropriate records be kept, and that quarterly reports be filed with the Commonwealth's Department of Health. And it prohibited solicitation or advertising with respect to abortions. A violation of § 6 was a misdemeanor of the first or third degrees, as specified.

Section 7 prohibited the use of public funds for an abortion in the absence of a certificate of a physician stating that the abortion was necessary in order to preserve the life or health of the mother. Finally, § 8 authorized the Department of Health to make rules and regulations with respect to performance of abortions and the facilities in which abortions were performed. See Pa. Stat. Ann., Tit. 35, §§ 6601–6608 (Purdon 1977).

Prior to the Act's effective date, October 10, 1974, the present suit was filed in the United States District Court for the Eastern District of Pennsylvania challenging, on federal constitutional grounds, nearly all of the Act's provisions.[3]

---

[3] The plaintiffs named in the complaint, as amended, were Planned Parenthood Association of Southeastern Pennsylvania, Inc., a nonprofit corporation; appellee John Franklin, M. D., a licensed and board-certified obstetrician and gynecologist and medical director of Planned Parenthood; Concern for Health Options: Information, Care and Education, Inc. (CHOICE), a nonprofit corporation; and Clergy Consultation Service of Northeastern Pennsylvania, a voluntary organization. Later, appellee Obstetrical Society of Philadelphia intervened as a party plaintiff. Named as original defendants were F. Emmett Fitzpatrick, Jr., District Attorney of Philadelphia County, and Helene Wohlgemuth, the then Secretary of Welfare of the Commonwealth of Pennsylvania. Subsequently, the Commonwealth's Attorney General and the Commonwealth itself intervened as parties defendant.

The District Court, in a ruling not under challenge here, eventually dismissed Planned Parenthood, CHOICE, and Clergy Consultation as plaintiffs. *Planned Parenthood Assn.* v. *Fitzpatrick,* 401 F. Supp. 554, 562, 593–594 (1975).

The present posture of the case, as a consequence, is a suit between Dr. Franklin and the Obstetrical Society, as plaintiffs-appellees, and Aldo

The three-judge court on October 10 issued a preliminary injunction restraining the enforcement of a number of those provisions.[4] Each side sought a class-action determination; the plaintiffs', but not the defendants', motion to this effect was granted.[5]

The case went to trial in January 1975. The court received extensive testimony from expert witnesses on all aspects of abortion procedures. The resulting judgment declared the Act to be severable, upheld certain of its provisions, and held other provisions unconstitutional. *Planned Parenthood Assn.* v. *Fitzpatrick,* 401 F. Supp. 554 (1975).[6] The court sustained the definition of "informed consent" in § 2; the facility-approval requirement and certain of the reporting requirements of § 6; § 8's authorization of rules and regulations; and, by a divided vote, the informed consent requirement of § 3 (a). It overturned § 3 (b)(i)'s spousal-consent require-

Colautti, the present Secretary of Welfare, the Attorney General, the Commonwealth, and the District Attorney, as defendants-appellants.

We agree with the District Court's ruling in the cited 1975 opinion, 401 F. Supp., at 561–562, 594, that under *Doe* v. *Bolton,* 410 U. S. 179, 188 (1973), the plaintiff physicians have standing to challenge § 5 (a), and that their claims present a justiciable controversy. See *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 62 (1976).

[4] The court preliminarily enjoined the enforcement of the spousal- and parental-consent requirements, § 3 (b); the penal provisions of § 3 (e); the requirements of §§ 5 (a) and (d); the restriction on abortions subsequent to viability, § 6 (b); the facility-approval requirement, § 6 (c); the reporting provisions, § 6 (d); most of the penal provisions of § 6 (i); the restrictions on funding of abortions, § 7; and the definitions of "viable" and "informed consent" in § 2. Record, Doc. No. 16; see *Planned Parenthood Assn.* v. *Fitzpatrick,* 401 F. Supp., at 559.

[5] The court ruled that "the present action is determined to be a class action on behalf of the class of Pennsylvania physicians who perform abortions and/or counsel their female patients with regard to family planning and pregnancy including the option of abortion, and the sub-class of members of the Obstetrical Society of Philadelphia who practice in Pennsylvania." Record, Doc. No. 57.

[6] See also *Doe* v. *Zimmerman,* 405 F. Supp. 534 (MD Pa. 1975).

ment and, again by a divided vote, § 3 (b) (ii)'s parental-consent requirement; § 6's reporting requirements relating to spousal and parental consent; § 6's prohibition of advertising; and § 7's restriction on abortion funding. The definition of "viable" in § 2 was declared void for vagueness and, because of the incorporation of this definition, § 6's proscription of abortions after viability, except to preserve the life or health of the woman, was struck down. Finally, in part because of the incorporation of the definition of "viable," and in part because of the perceived overbreadth of the phrase "may be viable," the court invalidated the viability-determination and standard-of-care provisions of § 5 (a). 401 F. Supp., at 594.

Both sides appealed to this Court. While the appeals were pending, the Court decided *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976); *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976); and *Singleton* v. *Wulff,* 428 U. S. 106 (1976). *Virginia State Board* shed light on the prohibition of advertising for abortion services. *Planned Parenthood* had direct bearing on the patient-, spousal-, and parental-consent issues and was instructive on the definition-of-viability issue. *Singleton* concerned the issue of standing to challenge abortion regulations. Accordingly, that portion of the three-judge court's judgment which was the subject of the plaintiffs' appeal was summarily affirmed. *Franklin* v. *Fitzpatrick,* 428 U. S. 901 (1976). And that portion of the judgment which was the subject of the defendants' appeal was vacated and remanded for further consideration in the light of *Planned Parenthood, Singleton,* and *Virginia State Board. Beal* v. *Franklin,* 428 U. S. 901 (1976).

On remand, the parties entered into a stipulation which disposed of all issues except the constitutionality of §§ 5 (a) and 7. Relying on this Court's supervening decisions in *Beal* v. *Doe,* 432 U. S. 438 (1977), and *Maher* v. *Roe,* 432 U. S. 464 (1977), the District Court found, contrary to its original view,

see 401 F. Supp., at 594, that § 7 did not violate either Tit. XIX of the Social Security Act, as added, 79 Stat. 343, and amended, 42 U. S. C. § 1396 *et seq.*, or the Equal Protection Clause of the Fourteenth Amendment. App. 241a. The court, however, declared: "After reconsideration of section 5 (a) in light of the most recent Supreme Court decisions, we adhere to our original view and decision that section 5 (a) is unconstitutional." *Id.*, at 240a–214a. Since the plaintiffs-appellees have not appealed from the ruling with respect to § 7, the only issue remaining in this protracted litigation is the validity of § 5 (a).

II

Three cases in the sensitive and earnestly contested abortion area provide essential background for the present controversy.

In *Roe* v. *Wade*, 410 U. S. 113 (1973), this Court concluded that there is a right of privacy, implicit in the liberty secured by the Fourteenth Amendment, that "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.*, at 153. This right, we said, although fundamental, is not absolute or unqualified, and must be considered against important state interests in the health of the pregnant woman and in the potential life of the fetus. "These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.' " *Id.*, at 162–163. For both logical and biological reasons, we indicated that the State's interest in the potential life of the fetus reaches the compelling point at the stage of viability. Hence, prior to viability, the State may not seek to further this interest by directly restricting a woman's decision whether or not to terminate her pregnancy.[7] But after viability, the

_____

[7] In *Maher* v. *Roe*, 432 U. S. 464, 471–477 (1977), the Court ruled that a State may withhold funding to indigent women even though such withholding influences the abortion decision prior to viability. The Court, however, reaffirmed that a State during this period may not impose direct

State, if it chooses, may regulate or even prohibit abortion except where necessary, in appropriate medical judgment, to preserve the life or health of the pregnant woman. *Id.,* at 163–164.

We did not undertake in *Roe* to examine the various factors that may enter into the determination of viability. We simply observed that, in the medical and scientific communities, a fetus is considered viable if it is "potentially able to live outside the mother's womb, albeit with artificial aid." *Id.,* at 160. We added that there must be a potentiality of "meaningful life," *id.,* at 163, not merely momentary survival. And we noted that viability "is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Id.,* at 160. We thus left the point flexible for anticipated advancements in medical skill.

*Roe* stressed repeatedly the central role of the physician, both in consulting with the woman about whether or not to have an abortion, and in determining how any abortion was to be carried out. We indicated that up to the points where important state interests provide compelling justifications for intervention, "the abortion decision in all its aspects is inherently, and primarily, a medical decision," *id.,* at 166, and we added that if this privilege were abused, "the usual remedies, judicial and intra-professional, are available." *Ibid.*

*Roe*'s companion case, *Doe* v. *Bolton,* 410 U. S. 179 (1973), underscored the importance of affording the physician adequate discretion in the exercise of his medical judgment. After the Court there reiterated that "a pregnant woman does not have an absolute constitutional right to an abortion on her demand," *id.,* at 189, the Court discussed, in a vagueness-attack context, the Georgia statute's requirement that a physician's decision to perform an abortion must rest upon "his best clinical judgment." The Court found it critical that that

---

obstacles—such as criminal penalties—to further its interest in the potential life of the fetus.

judgment "may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient." *Id.*, at 192.

The third case, *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52 (1976), stressed similar themes. There a Missouri statute that defined viability was challenged on the ground that it conflicted with the discussion of viability in *Roe* and that it was, in reality, an attempt to advance the point of viability to an earlier stage in gestation. The Court rejected that argument, repeated the *Roe* definition of viability, 428 U. S., at 63, and observed again that viability is "a matter of medical judgment, skill, and technical ability, and we preserved [in *Roe*] the flexibility of the term." *Id.*, at 64. The Court also rejected a contention that "a specified number of weeks in pregnancy must be fixed by statute as the point of viability." *Id.*, at 65. It said:

> "In any event, we agree with the District Court that it is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period. The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician." *Id.*, at 64.

In these three cases, then, this Court has stressed viability, has declared its determination to be a matter for medical judgment, and has recognized that differing legal consequences ensue upon the near and far sides of that point in the human gestation period. We reaffirm these principles. Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support. Because this point may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering

into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus. Viability is the critical point. And we have recognized no attempt to stretch the point of viability one way or the other.

With these principles in mind, we turn to the issues presented by the instant controversy.

## III

The attack mounted by the plaintiffs-appellees upon § 5 (a) centers on both the viability-determination requirement and the stated standard of care. The former provision, requiring the physician to observe the care standard when he determines that the fetus is viable, or when "there is sufficient reason to believe that the fetus may be viable," is asserted to be unconstitutionally vague because it fails to inform the physician when his duty to the fetus arises, and because it does not make the physician's good-faith determination of viability conclusive. This provision is also said to be unconstitutionally overbroad, because it carves out a new time period prior to the stage of viability, and could have a restrictive effect on a couple who wants to abort a fetus determined by genetic testing to be defective.[8]  The standard of care, and in particular the requirement that the physician employ the abortion technique "which would provide the best opportunity for the fetus to be aborted alive so long as a different technique would not be necessary in order to preserve the life or health of the mother," is said to be void for vagueness and to be unconstitutionally restrictive in failing to afford

[8] The plaintiffs-appellees introduced evidence that modern medical technology makes it possible to detect whether a fetus is afflicted with such disorders as Tay-Sachs disease and Down's syndrome (mongolism). Such testing, however, often cannot be completed until after 18–20 weeks' gestation. App. 53a–56a (testimony of Hope Punnett, Ph. D.).

the physician sufficient professional discretion in determining which abortion technique is appropriate.

The defendants-appellants, in opposition, assert that the Pennsylvania statute is concerned only with post-viability abortions and with prescribing a standard of care for those abortions. They assert that the terminology "may be viable" correctly describes the statistical probability of fetal survival associated with viability; that the viability-determination requirement is otherwise sufficiently definite to be interpreted by the medical community; and that it is for the legislature, not the judiciary, to determine whether a viable but genetically defective fetus has a right to life. They contend that the standard-of-care provision preserves the flexibility required for sound medical practice, and that it simply requires that when a physician has a choice of procedures of equal risk to the woman, he must select the procedure least likely to be fatal to the fetus.

IV

We agree with plaintiffs-appellees that the viability-determination requirement of § 5 (a) is ambiguous, and that its uncertainty is aggravated by the absence of a scienter requirement with respect to the finding of viability. Because we conclude that this portion of the statute is void for vagueness, we find it unnecessary to consider appellees' alternative arguments based on the alleged overbreadth of § 5 (a).

A

It is settled that, as a matter of due process, a criminal statute that "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States* v. *Harriss,* 347 U. S. 612, 617 (1954), or is so indefinite that "it encourages arbitrary and erratic arrests and convictions," *Papachristou* v. *Jacksonville,* 405 U. S. 156, 162 (1972), is void for vagueness. See generally *Grayned* v. *City of Rockford,* 408 U. S. 104, 108–109 (1972).

This appears to be especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights. *Id.*, at 109; *Smith* v. *Goguen,* 415 U. S. 566, 573 (1974); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603–604 (1967).

Section 5 (a) requires every person who performs or induces an abortion to make a determination, "based on his experience, judgment or professional competence," that the fetus is not viable. If such person determines that the fetus is viable, or if "there is sufficient reason to believe that the fetus may be viable," then he must adhere to the prescribed standard of care. See n. 1, *supra.* This requirement contains a double ambiguity. First, it is unclear whether the statute imports a purely subjective standard, or whether it imposes a mixed subjective and objective standard. Second, it is uncertain whether the phrase "may be viable" simply refers to viability, as that term has been defined in *Roe* and in *Planned Parenthood,* or whether it refers to an undefined penumbral or "gray" area prior to the stage of viability.

The statute requires the physician to conform to the prescribed standard of care if one of two conditions is satisfied: if he determines that the fetus "is viable," or "if there is sufficient reason to believe that the fetus may be viable." Apparently, the determination of whether the fetus "is viable" is to be based on the attending physician's "experience, judgment or professional competence," a subjective point of reference. But it is unclear whether the same phrase applies to the second triggering condition, that is, to "sufficient reason to believe that the fetus may be viable." In other words, it is ambiguous whether there must be "sufficient reason" from the perspective of the judgment, skill, and training of the attending physician, or "sufficient reason" from the perspective of a cross section of the medical community or a panel of experts. The latter, obviously, portends not an inconsequential hazard for the typical private practitioner who may not

have the skills and technology that are readily available at a teaching hospital or large medical center.

The intended distinction between the phrases "is viable" and "may be viable" is even more elusive. Appellants argue that no difference is intended, and that the use of the "may be viable" words "simply incorporates the acknowledged medical fact that a fetus is 'viable' if it has that statistical 'chance' of survival recognized by the medical community." Brief for Appellants 28. The statute, however, does not support the contention that "may be viable" is synonymous with, or merely intended to explicate the meaning of, "viable." [9]

Section 5 (a) requires the physician to observe the prescribed standard of care if he determines "that the fetus is viable *or* if there is sufficient reason to believe that the fetus may be viable" (emphasis supplied). The syntax clearly implies that there are two distinct conditions under which the physician must conform to the standard of care. Appellants' argument that "may be viable" is synonymous with "viable" would make either the first or the second condition redundant or largely superfluous, in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative. See *United States* v. *Menasche,* 348 U. S. 528, 538–539 (1955).

Furthermore, the suggestion that "may be viable" is an explication of the meaning of "viable" flies in the face of the fact that the statute, in § 2, already defines "viable." This, presumably, was intended to be the exclusive definition of "viable" throughout the Act.[10] In this respect, it is significant

---

[9] Appellants do not argue that federal-court abstention is required on this issue, nor is it appropriate, given the extent of the vagueness that afflicts § 5 (a), for this Court to abstain *sua sponte.* See *Bellotti* v. *Baird,* 428 U. S. 132, 143 n. 10 (1976).

[10] The statute says that viable "means," not "includes," the capability of a fetus "to live outside the mother's womb albeit with artificial aid." As a rule, "[a] definition which declares what a term 'means' . . . excludes

that § 6 (b) of the Act speaks only of the limited availability of abortion during the stage of a pregnancy "subsequent to viability." The concept of viability is just as important in § 6 (b) as it is in § 5 (a). Yet in § 6 (b) the legislature found it unnecessary to explain that a "viable" fetus includes one that "may be viable."

Since we must reject appellants' theory that "may be viable" means "viable," a second serious ambiguity appears in the statute. On the one hand, as appellees urge and as the District Court found, see 401 F. Supp., at 572, it may be that "may be viable" carves out a new time period during pregnancy when there is a remote possibility of fetal survival outside the womb, but the fetus has not yet attained the reasonable likelihood of survival that physicians associate with viability. On the other hand, although appellants do not argue this, it may be that "may be viable" refers to viability as physicians understand it, and "viable" refers to some undetermined stage later in pregnancy. We need not resolve this question. The crucial point is that "viable" and "may be viable" apparently refer to distinct conditions, and that one of these conditions differs in some indeterminate way from the definition of viability as set forth in *Roe* and in *Planned Parenthood*.[11]

Because of the double ambiguity in the viability-determination requirement, this portion of the Pennsylvania statute is readily distinguishable from the requirement that an abortion must be "necessary for the preservation of the mother's life or health," upheld against a vagueness challenge in *United*

---

any meaning that is not stated." 2A C. Sands, Statutes and Statutory Construction § 47.07 (4th ed. Supp. 1978).

[11] Since our ruling today is confined to the conclusion that the viability-determination requirement of § 5 (a) is impermissibly vague, there is no merit in the dissenting opinion's suggestion, *post*, at 406, that the Court has "tacitly disown[ed]" the definition of viability as set forth in *Roe* and *Planned Parenthood*. On the contrary, as noted above, *supra*, at 388, we *reaffirm* what was said in those decisions about this critical concept.

*States* v. *Vuitch,* 402 U. S. 62, 69–72 (1971), and the requirement that a physician determine, on the basis of his "best clinical judgment," that an abortion is "necessary," upheld against a vagueness attack in *Doe* v. *Bolton,* 410 U. S., at 191–192. The contested provisions in those cases had been interpreted to allow the physician to make his determination in the light of all attendant circumstances—psychological and emotional as well as physical—that might be relevant to the well-being of the patient. The present statute does not afford broad discretion to the physician. Instead, it conditions potential criminal liability on confusing and ambiguous criteria. It therefore presents serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights.

## B

The vagueness of the viability-determination requirement of § 5 (a) is compounded by the fact that the Act subjects the physician to potential criminal liability without regard to fault. Under § 5 (d), see n. 1, *supra,* a physician who fails to abide by the standard of care when there is sufficient reason to believe that the fetus "may be viable" is subject "to such civil or criminal liability as would pertain to him had the fetus been a child who was intended to be born and not aborted." To be sure, the Pennsylvania law of criminal homicide, made applicable to the physician by § 5 (d), conditions guilt upon a finding of scienter. See Pa. Stat. Ann., Tit. 18, §§ 2501–2504 (Purdon 1973 and Supp. 1978). The required mental state, however, is that of "intentionally, knowingly, recklessly or negligently caus[ing] the death of another human being." § 2501 (1973). Thus, the Pennsylvania law of criminal homicide requires scienter with respect to whether the physician's actions will result in the death of the fetus. But neither the Pennsylvania law of criminal homicide, nor the Abortion Control Act, requires that the

physician be culpable in failing to find sufficient reason to believe that the fetus may be viable.[12]

This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.* See, for example, *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 434–446 (1978); *Papachristou* v. *Jacksonville,* 405 U. S., at 163; *Boyce Motor Lines* v. *United States,* 342 U. S. 337, 342 (1952).[13] Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is little more than "a trap for those who act in good faith." *United States* v. *Ragen,* 314 U. S. 513, 524 (1942).

The perils of strict criminal liability are particularly acute here because of the uncertainty of the viability determination itself. As the record in this case indicates, a physician determines whether or not a fetus is viable after considering a number of variables: the gestational age of the fetus, derived from the reported menstrual history of the woman; fetal weight, based on an inexact estimate of the size and condition of the uterus; the woman's general health and nutrition; the

---

[12] Section 5 (a) does provide that the determination of viability is to be based on the physician's "experience, judgment or professional competence." A subjective standard keyed to the physician's individual skill and abilities, however, is different from a requirement that the physician be culpable or blameworthy for his performance under such a standard. Moreover, as noted above, it is ambiguous whether this subjective language applies to the second condition that activates the duty to the fetus, namely, "sufficient reason to believe that the fetus may be viable."

[13] "[T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. . . . The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Screws* v. *United States,* 325 U. S. 91, 101–102 (1945) (plurality opinion).

quality of the available medical facilities; and other factors.[14] Because of the number and the imprecision of these variables, the probability of any particular fetus' obtaining meaningful life outside the womb can be determined only with difficulty. Moreover, the record indicates that even if agreement may be reached on the probability of survival, different physicians equate viability with different probabilities of survival, and some physicians refuse to equate viability with any numerical probability at all.[15] In the face of these uncertainties, it is not unlikely that experts will disagree over whether a particular fetus in the second trimester has advanced to the stage of viability. The prospect of such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination of viability, could have a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment.

Because we hold that the viability-determination provision of § 5 (a) is void on its face, we need not now decide whether, under a properly drafted statute, a finding of bad faith or some other type of scienter would be required before a physician could be held criminally responsible for an erroneous determination of viability. We reaffirm, however, that "the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician." *Planned Parenthood of Central Missouri* v.

---

[14] See App. 5a–6a, 10a, 17a (testimony of Louis Gerstley III, M. D.); *id.*, at 77a–78a, 81a (testimony of Thomas W. Hilgers, M. D.); *id.*, at 93a–101a, 109a, 112a (testimony of William J. Keenan, M. D.).

[15] See *id.*, at 8a (testimony of Dr. Gerstley) (viability means 5% chance of survival, "certainly at least two to three percent"); *id.*, at 104a (testimony of Dr. Keenan) (10% chance of survival would be viable); *id.*, at 144a (deposition of John Franklin, M. D.) (viability means "ten percent or better" probability of survival); *id.*, at 132a (testimony of Arturo Hervada, M. D.) (it is misleading to be obsessed with a particular percentage figure).

*Danforth,* 428 U. S., at 64. State regulation that impinges upon this determination, if it is to be constitutional, must allow the attending physician "the room he needs to make his best medical judgment." *Doe* v. *Bolton,* 410 U. S., at 192.

## V

We also conclude that the standard-of-care provision of § 5 (a) is impermissibly vague.[16] The standard-of-care provision, when it applies, requires the physician to

"exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted and the abortion technique employed shall be that which would provide the best opportunity for the fetus to be aborted alive so long as a different technique would not be necessary in order to preserve the life or health of the mother."

Plaintiffs-appellees focus their attack on the second part of the standard, requiring the physician to employ the abortion technique offering the greatest possibility of fetal survival, provided some other technique would not be necessary in order to preserve the life or health of the mother.[17]

---

[16] The dissenting opinion questions whether the alleged vagueness of the standard-of-care provision is properly before us, since it is said that this issue was not reached by the District Court. That court, however, declared § 5 (a) unconstitutional in its entirety, including both the viability-determination requirement and the standard-of-care provision. App. 243a. Appellees, as the prevailing parties, may of course assert any ground in support of that judgment, "whether or not that ground was relied upon or even considered by the trial court." *Dandridge* v. *Williams,* 397 U. S. 471, 475 n. 6 (1970).

[17] In *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 81–84 (1976), the Court struck down a provision similar to the first part of the standard-of-care provision of § 5 (a), on the ground that it applied at all stages of gestation and not just to the period subsequent to

The District Court took extensive testimony from various physicians about their understanding of this requirement. That testimony is illuminating. When asked what method of abortion they would prefer to use in the second trimester in the absence of § 5 (a), the plaintiffs' experts said that they thought saline amnio-infusion was the method of choice.[18] This was described as a method involving removal of amniotic fluid and injection of a saline or other solution into the amniotic sac. See *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S., at 75–79. All physicians agreed, however, that saline amnio-infusion nearly always is fatal to the fetus,[19] and it was commonly assumed that this method would be prohibited by the statute.

When the plaintiffs' and defendants' physician-experts respectively were asked what would be the method of choice under § 5 (a), opinions differed widely. Preferences ranged from no abortion, to prostaglandin infusion, to hysterotomy, to oxytocin induction.[20] Each method, it was generally conceded, involved disadvantages from the perspective of the woman. Hysterotomy, a type of Caesarean section procedure, generally was considered to have the highest incidence of fetal survival of any of the abortifacients. Hysterotomy, however, is associated with the risks attendant upon any operative procedure involving anesthesia and incision of

---

viability. Except to the extent that § 5 (a) is also alleged to apply prior to the point of viability, a contention we do not reach, see *supra*, at 390, appellees do not challenge the standard-of-care provision on overbreadth grounds.

[18] App. 11a (testimony of Dr. Gerstley); *id.*, at 28a (testimony of Dr. Franklin).

[19] See, *e. g.*, *id.*, at 28a (testimony of Dr. Franklin); *id.*, at 36a (testimony of Fred Mecklenburg, M. D.).

[20] There was testimony that dilation and curettage and dilation and suction, two of the more common methods of abortion in the first trimester, normally are not used in the second trimester. *Id.*, at 39a–40a (testimony of Dr. Mecklenburg).

tissue.[21]   And all physicians agreed that future children born
to a woman having a hysterotomy would have to be delivered
by Caesarean section because of the likelihood of rupture of
the scar.[22]

Few of the testifying physicians had had any direct experi-
ence with prostaglandins, described as drugs that stimulate
uterine contractibility, inducing premature expulsion of the
fetus.   See *Planned Parenthood of Central Missouri* v. *Dan-
forth*, 428 U. S., at 77–78.   It was generally agreed that the
incidence of fetal survival with prostaglandins would be sig-
nificantly greater than with saline amnio-infusion.[23]   Several
physicians testified, however, that prostaglandins have unde-
sirable side effects, such as nausea, vomiting, headache, and
diarrhea, and indicated that they are unsafe with patients
having a history of asthma, glaucoma, hypertension, cardio-
vascular disease, or epilepsy.[24]   See *Wynn* v. *Scott*, 449 F.
Supp. 1302, 1326 (ND Ill. 1978).   One physician recom-
mended oxytocin induction.   He doubted, however, whether
the procedure would be fully effective in all cases, and he in-
dicated that the procedure was prolonged and expensive.[25]

The parties acknowledge that there is disagreement among
medical authorities about the relative merits and the safety of
different abortion procedures that may be used during the
second trimester.   See Brief for Appellants 24.   The appel-
lants submit, however, that the only legally relevant con-
siderations are that alternatives exist among abortifacients,

[21] *Id.*, at 23a (testimony of Dr. Franklin); *id.*, at 43a (testimony of Dr.
Mecklenburg); *id.*, at 73a (testimony of Dr. Hilgers).

[22] See, *e. g.*, *id.*, at 13a (testimony of Dr. Gerstley); *id.*, at 28a (tes-
timony of Dr. Franklin).

[23] See, *e. g.*, *id.*, at 11a–12a (testimony of Dr. Gerstley); *id.*, at 28a
(testimony of Dr. Franklin).

[24] See *id.*, at 11a (testimony of Dr. Gerstley); *id.*, at 37a–38a (testi-
mony of Dr. Mecklenburg); *id.*, at 72a (testimony of Dr. Hilgers).

[25] *Id.*, at 12a (testimony of Dr. Gerstley).

400

"and that the physician, mindful of the state's interest in protecting viable life, must make a competent and good faith medical judgment on the feasibility of protecting the fetus' chance of survival in a manner consistent with the life and health of the pregnant woman." *Id.*, at 25. We read § 5 (a), however, to be much more problematical.

The statute does not clearly specify, as appellants imply, that the woman's life and health must always prevail over the fetus' life and health when they conflict. The woman's life and health are not mentioned in the first part of the stated standard of care, which sets forth the general duty to the viable fetus; they are mentioned only in the second part which deals with the choice of abortion procedures. Moreover, the second part of the standard directs the physician to employ the abortion technique best suited to fetal survival "so long as a different technique would not be *necessary* in order to preserve the life or health of the mother" (emphasis supplied). In this context, the word "necessary" suggests that a particular technique must be indispensable to the woman's life or health—not merely desirable—before it may be adopted. And "the life or health of the mother," as used in § 5 (a), has not been construed by the courts of the Commonwealth to mean, nor does it necessarily imply, that all factors relevant to the welfare of the woman may be taken into account by the physician in making his decision. Cf. *United States* v. *Vuitch,* 402 U. S., at 71–72; *Doe* v. *Bolton,* 410 U. S., at 191.

Consequently, it is uncertain whether the statute permits the physician to consider his duty to the patient to be paramount to his duty to the fetus, or whether it requires the physician to make a "trade-off" between the woman's health and additional percentage points of fetal survival. Serious ethical and constitutional difficulties, that we do not address, lurk behind this ambiguity. We hold only that where conflicting duties of this magnitude are involved, the

State, at the least, must proceed with greater precision before it may subject a physician to possible criminal sanctions.

Appellants' further suggestion that § 5 (a) requires only that the physician make a good-faith selection of the proper abortion procedure finds no support in either the language or an authoritative interpretation of the statute.[26] Certainly, there is nothing to suggest a *mens rea* requirement with respect to a decision whether a particular abortion method is necessary in order to preserve the life or health of the woman. The choice of an appropriate abortion technique, as the record in this case so amply demonstrates, is a complex medical judgment about which experts can—and do—disagree. The lack of any scienter requirement exacerbates the uncertainty of the statute. We conclude that the standard-of-care provision, like the viability-determination requirement, is void for vagueness.

The judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Because the Court now withdraws from the States a substantial measure of the power to protect fetal life that was reserved to them in *Roe* v. *Wade,* 410 U. S. 113 (1973), and reaffirmed in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), I file this dissent.

I

In *Roe* v. *Wade,* the Court defined the term "viability" to signify the stage at which a fetus is "potentially able to live outside the mother's womb, albeit with artificial aid." This is the point at which the State's interest in protecting fetal

---

[26] Appellants, again, do not argue or suggest that we should abstain from passing on this issue. See n. 9, *supra.*

life becomes sufficiently strong to permit it to "go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." 410 U. S., at 163–164.

The Court obviously crafted its definition of viability with some care, and it chose to define that term not as that stage of development at which the fetus actually *is* able or actually *has* the ability to survive outside the mother's womb, with or without artificial aid, but as that point at which the fetus is *potentially* able to survive. In the ordinary usage of these words, being *able* and being *potentially able* do not mean the same thing. Potential ability is not actual ability. It is ability "[e]xisting in possibility, not in actuality." Webster's New International Dictionary (2d ed. 1958). The Court's definition of viability in *Roe* v. *Wade* reaches an earlier point in the development of the fetus than that stage at which a doctor could say with assurance that the fetus *would* survive outside the womb.

It was against this background that the Pennsylvania statute at issue here was adopted and the District Court's judgment was entered. Insofar as *Roe* v. *Wade* was concerned, Pennsylvania could have defined viability in the language of that case—"potentially able to live outside the mother's womb"—and could have forbidden all abortions after this stage of any pregnancy. The Pennsylvania Act, however, did not go so far. It forbade entirely only those abortions where the fetus had attained viability as defined in § 2 of the Act, that is, where the fetus had "the *capability* . . . to live outside the mother's womb albeit with artificial aid." Pa. Stat. Ann., Tit. 35, § 6602 (Purdon 1977) (emphasis added). But the State, understanding that it also had the power under *Roe* v. *Wade* to regulate where the fetus was only "potentially able" to exist outside the womb, also sought to regulate, but not forbid, abortions where there was sufficient reason to believe that the fetus "may be viable"; this language was reasonably

believed by the State to be equivalent to what the Court meant in 1973 by the term "potentially able to live outside the mother's womb." Under § 5 (a), abortionists must not only determine whether the fetus is viable but also whether there is sufficient reason to believe that the fetus may be viable. If either condition exists, the method of abortion is regulated and a standard of care imposed. Under § 5 (d), breach of these regulations exposes the abortionist to the civil and criminal penalties that would be applicable if a live birth rather than an abortion had been intended.

In the original opinion and judgment of the three-judge court, *Planned Parenthood Assn.* v. *Fitzpatrick*, 401 F. Supp. 554 (ED Pa. 1975), § 5 (a) was invalidated on two grounds: first, because it required a determination of viability and because that term, as defined in § 2, was held to be unenforceably vague; and second, because the section required a determination of when a fetus may be viable, it was thought to regulate a period of time prior to viability and was therefore considered to be invalid under this Court's cases. The District Court was not disturbed by the fact that its opinion declared the term "viability" as used in this Court's opinion in *Roe* v. *Wade* to be hopelessly vague since it understood that opinion also to have given specific content to that term and to have held that a State could not consider any fetus to be viable prior to the 24th week of pregnancy. This was concrete guidance to the States, and because the "may be viable" provision of § 5 (a) "tend[ed] to carve out a . . . period of time of potential viability [which might cover a period of] 20 to 26 weeks gestation," 401 F. Supp., at 572, the State was unlawfully regulating the second trimester. Because it sought to enforce § 5 (a), § 5 (d) was also invalidated. Section 6 (b), which forbade all abortions after viability, also fell to the challenge of vagueness.

The District Court's judgment was pending on appeal here when *Planned Parenthood of Central Missouri* v. *Danforth,*

*supra,* was argued and decided. There, the state Act defined viability as "that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems." 428 U. S., at 63. This definition was attacked as impermissibly expanding the *Roe* v. *Wade* definition of viability; the "mere possibility of momentary survival," it was argued, was not the proper standard under the Court's cases. 428 U. S., at 63. It was also argued in this Court that the "may be" language of the Missouri statute was vulnerable for the same reasons that the "may be" provision of the Pennsylvania statute had been invalidated by the District Court in the case now before us. Brief for Appellants, O. T. 1975, No. 74–1151, pp. 65–66, quoting *Planned Parenthood Assn.* v. *Fitzpatrick, supra,* at 571–572. This Court, however, rejected these arguments and sustained the Missouri definition as consistent with *Roe,* "even when read in conjunction with" another section of the Act that proscribed all abortions not necessary to preserve the life or health of the mother "unless the attending physician first certifies with reasonable medical certainty that the fetus is not viable," that is, that it has not reached that stage at which it may exist indefinitely outside the mother's womb. 428 U. S., at 63–64. The Court noted that one of the appellant doctors "had no particular difficulty with the statutory definition" and added that the Missouri definition might well be considered more favorable to the complainants than the *Roe* definition since the "point when life can be 'continued indefinitely outside the womb' may well occur later in pregnancy than the point where the fetus is 'potentially able to live outside the mother's womb.'" 428 U. S., at 64. The Court went on to make clear that it was not the proper function of the legislature or of the courts to place viability at a specific point in the gestation period. The "flexibility of the term," which was essentially a medical concept, was to be preserved. *Ibid.* The Court plainly reaffirmed what it had held

in *Roe* v. *Wade:* Viability refers not only to that stage of development when the fetus actually has the capability of existing outside the womb but also to that stage when the fetus *may have* the ability to do so. The Court also reaffirmed that at any time after viability, as so understood, the State has the power to prohibit abortions except when necessary to preserve the life or health of the mother.

In light of *Danforth,* several aspects of the District Court's judgment in the *Fitzpatrick* case were highly questionable, and that judgment was accordingly vacated and remanded to the District Court for reconsideration. *Beal* v. *Franklin,* 428 U. S. 901 (1976). A drastically modified judgment eventuated. The term "viability" could not be deemed vague in itself, and hence the definition of that term in § 2 and the proscription of § 6 (b) against post-viability abortions were sustained. The District Court, however, in a conclusory opinion adhered to its prior view that § 5 (a) was unconstitutional, as was § 5 (d) insofar as it related to § 5 (a).

Affirmance of the District Court's judgment is untenable. The District Court originally thought § 5 (a) was vague because the term "viability" was itself vague. The Court scotched that notion in *Danforth,* and the District Court then sustained the Pennsylvania definition of viability. In doing so, it necessarily nullified the major reason for its prior invalidation of § 5 (a), which was that it incorporated the supposedly vague standard of § 2. But the District Court had also said that the "may be viable" standard was invalid as an impermissible effort to regulate a period of "potential" viability. This was the sole remaining articulated ground for invalidating § 5 (a). But this is the very ground that was urged and rejected in *Danforth,* where this Court sustained the Missouri provision defining viability as the stage at which the fetus "may" have the ability to survive outside the womb and reaffirmed the flexible concept of viability announced in *Roe.*

In affirming the District Court, the Court does not in so many words agree with the District Court but argues that it is too difficult to know whether the Pennsylvania Act simply intended, as the State urges, to go no further than *Roe* permitted in protecting a fetus that is potentially able to survive or whether it intended to carve out a protected period prior to viability as defined in *Roe*. The District Court, although otherwise seriously in error, had no such trouble with the Act. It understood the "may be viable" provision as an attempt to protect a period of potential life, precisely the kind of interest that *Roe* protected but which the District Court erroneously thought the State was not entitled to protect.[1] *Danforth*, as I have said, reaffirmed *Roe* in this respect. Only those with unalterable determination to invalidate the Pennsylvania Act can draw any measurable difference insofar as vagueness is concerned between "viability" defined as the ability to survive and "viability" defined as that stage at which the fetus may have the ability to survive. It seems to me that, in affirming, the Court is tacitly disowning the "may be" standard of the Missouri law as well as the "potential ability"

[1] The District Court observed:

"*Roe* makes it abundantly clear that the compelling point at which a state in the interest of fetal life may regulate, or even prohibit, abortion is not before the 24th week of gestation of the fetus, at which point the Supreme Court recognized the fetus then presumably *has the capability* of meaningful life outside the mother's womb. Consequently, *Roe* recognizes only two periods concerning fetuses. The period prior to viability, when the state may not regulate in the interest of fetal life, and the period after viability, when it may prohibit altogether or regulate as it sees fit. The 'may be viable' provision of Section 5 (a) tends to carve out a third period of time of *potential* viability." *Planned Parenthood Assn.* v. *Fitzpatrick*, 401 F. Supp. 554, 572 (ED Pa. 1975) (emphasis added). Thus, the court interpreted the term "viability" more restrictively than *Roe*, read in its entirety, permitted but coextensively with the definition in § 2. Based on its misapprehension of *Roe*, the court condemned § 5 (a) essentially for reaching the period when the fetus has the *potential* "capability of meaningful life outside the mother's womb." *Ibid.*

component of viability as that concept was described in *Roe*. This is a further constitutionally unwarranted intrusion upon the police powers of the States.

## II

Apparently uneasy with its work, the Court has searched for and seized upon two additional reasons to support affirmance, neither of which was relied upon by the District Court. The Court first notes that under § 5 (d), failure to make the determinations required by § 5 (a), or otherwise to comply with its provisions, subjects the abortionist to criminal prosecution under those laws that "would pertain to him had the fetus been a child who was intended to be born and not aborted." Although concededly the Pennsylvania law of criminal homicide conditions guilt upon a finding that the defendant intentionally, knowingly, recklessly, or negligently caused the death of another human being, the Court nevertheless goes on to declare that the abortionist could be successfully prosecuted for criminal homicide without any such fault or omission in determining whether or not the fetus is viable or may be viable. This alleged lack of a scienter requirement, the Court says, fortifies its holding that § 5 (a) is void for vagueness.

This seems to me an incredible construction of the Pennsylvania statutes. The District Court suggested nothing of the sort, and appellees focus entirely on § 5 (a), ignoring the homicide statutes. The latter not only define the specified degrees of scienter that are required for the various homicides, but also provide that ignorance or mistake as to a matter of fact, for which there is a reasonable explanation, is a defense to a homicide charge if it negatives the mental state necessary for conviction. Pa. Stat. Ann., Tit. 18, § 304 (Purdon 1973). Given this background, I do not see how it can be seriously argued that a doctor who makes a good-faith mistake about whether a fetus is or is not viable could be successfully prose-

cuted for criminal homicide. This is the State's submission in this Court; the court below did not address the matter; and at the very least this is something the Court should not decide without hearing from the Pennsylvania courts.

Secondly, the Court proceeds to find the standard-of-care provision in § 5 (a) to be impermissibly vague, particularly because of an asserted lack of a *mens rea* requirement. I am unable to agree. In the first place, the District Court found fault with § 5 (a) only because of its viability and "may be viable" provisions. It neither considered nor invalidated the standard-of-care provision. Furthermore, the complaint did not expressly attack § 5 (a) on this ground, and plaintiffs' request for findings and conclusions challenged the section only on the grounds of the overbreadth and vagueness of the viability and the "may be viable" provisions. There was no request to invalidate the standard-of-care provision. Also, the plaintiffs' post-trial brief dealt with the matter in only the most tangential way. Appellees took no cross-appeal; and although they argue the matter in their brief on the merits in this Court, I question whether they are entitled to have still another provision of the Pennsylvania Act declared unconstitutional in this Court in the first instance, thereby and to that extent expanding the relief they obtained in the court below.[2] *United States* v. *New York Telephone Co.,* 434 U. S. 159, 166 n. 8 (1977).

In any event, I cannot join the Court in its determined attack on the Pennsylvania statute. As in the case with a mistaken viability determination under § 5 (a), there is no basis for asserting the lack of a scienter requirement in a prosecution for violating the standard-of-care provision. I agree with the State that there is not the remotest chance that any abortionist will be prosecuted on the basis of a good-

---

[2] Unquestionably, rehabilitating § 5 (a) to satisfy this Court's opinion will be a far more extensive and more difficult task than that which the State faced under the District Court's ruling.

faith mistake regarding whether to abort, and if he does, with respect to which abortion technique is to be used. If there is substantial doubt about this, the Court should not complain of a lack of an authoritative state construction, as it does, but should direct abstention and permit the state courts to address the issues in the light of the Pennsylvania homicide laws with which those courts are so much more familiar than are we or any other federal court.

### III

Although it seems to me that the Court has considerably narrowed the scope of the power to forbid and regulate abortions that the States could reasonably have expected to enjoy under *Roe* and *Danforth,* the Court has not yet invalidated a statute simply requiring abortionists to determine whether a fetus is viable and forbidding the abortion of a viable fetus except where necessary to save the life or health of the mother. Nor has it yet ruled that the abortionist's determination of viability under such a standard must be final and is immune to civil or criminal attack. Sections 2 and 6 (b) of the Pennsylvania law, for example, remain undisturbed by the District Court's judgment or by the judgment of this Court.

What the Court has done is to issue a warning to the States, in the name of vagueness, that they should not attempt to forbid or regulate abortions when there is a chance for the survival of the fetus, but it is not sufficiently large that the abortionist considers the fetus to be viable. This edict has no constitutional warrant, and I cannot join it.