THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARGARET JIHAN, Defendant-Appellant.

Fifth District   No. 5—86—0582

Opinion filed January 12, 1988.

Howard B. Eisenberg, of Southern Illinois University, and Kari Koeppel, law student, both of Carbondale, for appellant.

John R. Clemons, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Wendy B. Porter, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE HARRISON delivered the opinion of the court:

In this appeal from a criminal conviction for practicing midwifery without a license, defendant, Margaret Jihan, contends the statute under which she was convicted is unconstitutionally vague because the term midwifery is not defined. We agree with defendant's contention and reverse the judgment of conviction and sentence for the reasons which follow.

Defendant was charged by indictment with involuntary manslaughter and practicing midwifery without a license. The circuit court of Jackson County subsequently dismissed the charge of involuntary manslaughter, and defendant was tried before the court on the remaining charge. The trial court convicted defendant of practicing midwifery without a license, and sentenced her to one year of probation and ordered her to serve six months of "electronic home confinement" from 10 p.m. until noon six days per week as a condition of probation.

The State's primary witness at trial was Lynn Trella, a detective with the Carbondale police department. Detective Trella testified that she interviewed defendant on May 21, 1985, and her testimony consisted primarily of what defendant told her in that interview. Detective Trella testified that defendant told her she was in graduate school taking courses in health education. Defendant had been a mid-

wife for approximately five years. She had spent seven years in informal training in the field of childbirth. A woman named Hanizah Hashim, who was expecting her first child, had planned to deliver the baby at a new birthing center, but the center was not scheduled to open by Mrs. Hashim's due date, so a doctor referred her to defendant so that Mrs. Hashim could deliver at home. Mrs. Hashim contacted defendant six to eight weeks prior to giving birth, and defendant later met with Mrs. Hashim and her husband for purposes of "education and awareness."

On May 16, 1985, Mrs. Hashim telephoned defendant and reported that her "bag of waters" had ruptured. Defendant advised Mrs. Hashim regarding methods of inducing labor, including "breast stimulation, long walks, and hot showers." Defendant went to Mrs. Hashim's apartment on May 16 to check on her condition and returned again on May 17. Defendant was at Mrs. Hashim's apartment "on and off all day" on May 17, and spent the night there, observing the progress of her labor and monitoring the child's heartbeat. At 8 a.m. on May 18, Mrs. Hashim began active labor. Defendant continued to monitor the baby's heartbeat and the progress of the labor. At approximately 7 p.m. on May 18, Mrs. Hashim passed a bloody discharge, and meconium was present in the discharge. Meconium is fecal material coming from the infant. The two women discussed whether Mrs. Hashim should consider going to the hospital, but Mrs. Hashim expressed her desire to remain at home. Defendant then conducted an internal exam, determining that Mrs. Hashim's cervix was dilated eight centimeters. Defendant checked the baby's heartbeat every 15 minutes until the child was born.

Defendant was present during the delivery. The baby's head was delivered first. Defendant observed meconium on the child, a boy, and wiped his face and began suctioning his nose using a ball syringe. Then the remainder of the child was delivered. Defendant continued the suctioning and began massaging the baby, then placed him on his mother. Defendant wiped more meconium from the infant, then clamped and cut the umbilical cord. She instructed an assistant to begin massaging Mrs. Hashim's abdomen. The record does not reveal the identity of this assistant. Defendant then took the baby into the bathroom and turned on the hot water in the shower to create steam. The baby became unresponsive, so defendant began cardiopulmonary resuscitation. At some point during these events, defendant had told someone present to call for an ambulance. Defendant carried the baby outside to meet the ambulance crew. She gave the emergency personnel a brief history of the birth, and after they left

with the baby, defendant went back into the apartment to check on Mrs. Hashim. The assistant had failed to do the massage which defendant had requested, and Mrs. Hashim was bleeding. Defendant also saw that the placenta would not expel, so she called for another ambulance to take Mrs. Hashim to the hospital.

Detective Trella also testified that she asked defendant during the interview whether she charged a fee for her services, and defendant replied that she generally received from $2 to $5 an hour. On cross-examination, the detective testified that defendant told her that her role at births was as a patient advocate and labor coach.

The State also introduced into evidence a release signed by Mrs. Hashim and her husband releasing defendant "from any responsibility associated with any complications which may come up, or be apparent, at any time in connection with the birth of our child." The release states they asked defendant to be present at the birth "as a midwife." It further states: "We further realize that Maggie Jihan does not have a license as a midwife, and that Illinois does not license midwives. We understand that Maggie Jihan does not hold herself out to the public as a midwife, but is only agreeing to attend our birth because she feels she could be of help to us."

The parties stipulated that if called to testify, Dave Meiners, a member of the ambulance crew which attended to the Hashim baby, would testify that when he arrived at the apartment, defendant was outside holding a newborn male infant. Defendant told him the child had been born seven minutes prior to the arrival of the ambulance and had never breathed after birth. After taking the baby to the hospital, Meiners returned to the apartment to find a mother who apparently had just given birth and transported her to the hospital.

The State also presented certificates from the Department of Registration and Education which state that defendant has not made application to practice as a physician, surgeon, chiropractor, midwife, or registered professional nurse, and does not hold a license under either the Medical Practice Act (Act) (Ill. Rev. Stat. 1985, ch. 111, par. 4401 *et seq.*) or the Illinois Nursing Act (Ill. Rev. Stat. 1985, ch. 111, par. 3401 *et seq.*).

Upon this evidence, the trial court convicted defendant of practicing midwifery without a license and sentenced her to probation, with the probation to include "electronic home confinement." On appeal, defendant contends the provisions of the Medical Practice Act which make it a crime to practice midwifery without a license are unconstitutionally vague because they do not include any definition of midwifery.

■■ ■ The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. (*Kolender v. Lawson* (1983), 461 U.S. 352, 357, 75 L. Ed. 2d 903, 909, 103 S. Ct. 1855, 1858; *People v. Bales* (1985), 108 Ill. 2d 182, 188, 483 N.E.2d 517, 520.) To sustain a vagueness challenge, the complainant must prove that the statute is vague "not in the sense that it requires a person to conform his [or her] conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati* (1971), 402 U.S. 611, 614, 29 L. Ed. 2d 214, 217, 91 S. Ct. 1686, 1688.

Section 11 of the Medical Practice Act provides for three types of licenses which can be issued, including (1) a license to practice medicine in all of its branches, (2) a license to treat human ailments without the use of drugs or medicines and without operative surgery, and (3) a license to practice midwifery. (Ill. Rev. Stat. 1985, ch. 111, par. 4421.) (We note that under section 5(3) of the Act (Ill. Rev. Stat. 1985, ch. 111, par. 4411(3)), no new licenses for midwives were to be issued after 1963.) Section 2 of the Act provides that "[n]o person shall practice medicine, or any of its branches, or midwifery, or any system or method of treating human ailments without the use of drugs or medicines and without operative surgery, without a valid, existing license so to do." (Ill. Rev. Stat. 1985, ch. 111, par. 4403.) Sections 25 and 29 (Ill. Rev. Stat. 1985, ch. 111, pars. 4460, 4464) provide that any person who practices midwifery without a valid license shall be sentenced as provided in section 35.1 of the Act (Ill. Rev. Stat. 1985, ch. 111, par. 4471). Nowhere in these provisions is there a definition of midwifery.

Section 5(3) of the Act (Ill. Rev. Stat. 1985, ch. 111, par. 4411(3)) provides for the minimum standards of professional education required for the practice of midwifery, requiring that a person desiring to be licensed as a midwife "be a graduate of a college of midwifery which requires as a prerequisite to admission thereto, a one year's course of instruction in a high school or its equivalent, and required as a prerequisite to graduation, a one year's course in such college of midwifery, the time actually spent under instruction in such college of midwifery to have been not less than 12 months; such high school or equivalent school, and such college of midwifery having been in good standing in the judgment of the department." This section outlining the educational requirements for midwives does not reveal the

nature of study at a college of midwifery or otherwise define midwifery.

The only other references to midwives which we have found in the laws of this State are a provision imposing a duty upon "any physician, surgeon, obstetrician, midwife, nurse, maternity home or hospital, of any nature or parent assisting in any way whatsoever, any woman at childbirth" to report to health officials when it is determined an infant has a condition known as ophthalmia neonatorum (Ill. Rev. Stat. 1985, ch. 111½, par. 4702), and a provision imposing a duty upon "any physician, midwife or nurse who attends or assists at the birth of a child" to instill in the newborn's eyes a solution of silver nitrate for the prevention of ophthalmia neonatorum. (Ill. Rev. Stat. 1985, ch. 111½, par. 4703.) These provisions do little to aid us in determining a definition of a midwife or in determining what constitutes the practice of midwifery.

■■ The State argues that the term midwifery has a common and popularly understood meaning, *i.e.*, assisting in childbirth. In support of its argument, the State cites cases from other jurisdictions, including the Missouri Supreme Court's decision in *State ex rel. Missouri State Board of Registration for the Healing Arts v. Southworth* (Mo. 1986), 704 S.W.2d 219 (*en banc*), which held that the words "practice of midwifery" are words of common usage and mean assisting at childbirth. However, *Southworth* and the other cases cited by the State were decided in the context of civil proceedings, and as defendant correctly argues, penal statutes are construed more strictly than civil statutes. (See *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 498-99, 71 L. Ed. 2d 362, 372, 102 S. Ct. 1186, 1193.) A criminal statute must be strictly construed in favor of the accused. *People v. Christensen* (1984), 102 Ill. 2d 321, 328, 465 N.E.2d 93, 96.

We do not believe, in the context of a criminal prosecution, that the statutes here define the offense with sufficient definiteness that a person of ordinary intelligence can understand what conduct is prohibited or in a manner which would prevent arbitrary and discriminatory enforcement. (*People v. Bales* (1985), 108 Ill. 2d 182, 188, 483 N.E.2d 517, 520.) We note that the legislature has deemed it necessary to delineate in detail what acts constitute podiatry (Ill. Rev. Stat. 1985, ch. 111, par. 4906), optometry (Ill. Rev. Stat. 1985, ch. 111, par. 3803), dentistry (Ill. Rev. Stat. 1985, ch. 111, pars. 2304, 2317), nursing (Ill. Rev. Stat. 1985, ch. 111, par. 3405), as well as other professional occupations. We note with interest that the legislature has even deemed it appropriate to define barbering (Ill. Rev.

Stat. 1985, ch. 111, par. 1702—1), a term which is much more susceptible to understanding by a person of ordinary intelligence than the term midwifery.

Moreover, the Medical Practice Act does not include a *scienter* requirement in the provisions prohibiting the practice of midwifery without a license. This lends to the vagueness of the provisions. The United States Supreme Court has stated that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a *scienter* requirement. (*Colautti v. Franklin* (1979), 439 U.S. 379, 395, 58 L. Ed. 2d 596, 609, 99 S. Ct. 675, 685.) The Illinois Supreme Court has recently held that where there is a conflict in a criminal statute regarding the *scienter* requirement, citizens are not afforded fair notice of what conduct is prohibited and law enforcement personnel are not provided clear standards in applying the law, meaning there exists the danger of arbitrary and discriminatory enforcement. (See *People v. Monroe* (1987), 118 Ill. 2d 298, 305.) In the present case, there is no *scienter* requirement at all. We believe that due process is offended in this case because the statutory provisions are so incomplete, vague, indefinite and uncertain that men of ordinary intelligence must necessarily guess at their meaning and differ as to their application.

We therefore hold that the provisions of the Medical Practice Act making it a crime to practice midwifery without a license are unconstitutionally vague within the meaning of the due process provisions of the United States Constitution and the Illinois Constitution.

For the foregoing reasons, the judgment of the circuit court of Jackson County is reversed.

Reversed.

LEWIS and CALVO, JJ., concur.