**Mary and John SMITH, individually and on behalf of all others similarly situated, and Aaron Lifchez, Plaintiffs,**

v.

**Neil F. HARTIGAN, Attorney General of the State of Illinois; and Richard M. Daley, State's Attorney of Cook County, Illinois, in their official capacities, Defendants.**

No. 82 C 4324.

United States District Court,<br/>N.D. Illinois, E.D.

Feb. 4, 1983.

---

Frances H. Krasnow, Fohrman, Lurie, Sklar & Simon, Ltd., Lois Lipton, The Roger Baldwin Foundation of ACLU, Chicago, Ill., for plaintiffs.

Judith Mostovoy, Asst. Atty. Gen., Elizabeth J. Cohen, Mark R. Davis, Asst. States Attys., Chicago, Ill., for defendants.

MEMORANDUM OPINION

FLAUM, District Judge:

This matter is before the court on plaintiffs' consolidated motions for preliminary and permanent injunctions pursuant to Fed. R.Civ.P. 65 and for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated below, the motions are denied and this cause is dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).

In this action, the plaintiffs [1] challenge the constitutionality of a provision in the Illinois Abortion Law of 1975, as amended. Ill.Rev.Stat. ch. 38, § 81–21 et seq. (1981) ("the Act"). The plaintiffs John and Mary Smith [2] are a married couple who have unsuccessfully attempted to have a baby and who now wish to attempt conception through in vitro fertilization. Plaintiff Aaron Lifchez ("Lifchez") is a medical doctor and a member of the Department of Obstetrics and Gynecology at Michael Reese Hospital in Chicago, Illinois. [3] He is a physician to Mary Smith and has determined that Mary Smith is unable to conceive because of irreversibly damaged fallopian tubes. Lifchez has concluded that in vitro fertilization [4] is the only means by which Mary Smith has a chance of conceiving a child and he states that Michael Reese Hospital has facilities and physicians who are ready and willing to facilitate the in vitro fertilization process. However, because of what is believed to be an Illinois statutory prohibition of in vitro fertilization, Lifchez states that responsible physicians and institutions cannot offer that medical service to people such as Mary Smith. The statute to which Lifchez refers and which is challenged here is section 6(7) of the Act. That section provides:

> Any person who intentionally causes the fertilization of a human ovum by a human sperm outside the body of a living human female shall, with regard to the human being thereby produced, be deemed to have the care and custody of a child for the purposes of Section 4 of the Act to Prevent and Punish Wrongs to Children, approved May 17, 1877, as amended, [Ill.Rev.Stat. ch. 23, § 2354 (1981)] except that nothing in that Section shall be construed to attach any pen-

---

1. The case is being maintained in part as a class action. On September 10, 1982, the court certified a class after defendants represented that such a class would be appropriate. Accordingly, this action is pursued on behalf of "plaintiffs Mary and John Smith and all others similarly situated, namely all married couples for whom in vitro fertilization is prescribed by their physicians as the only available method of conception and who desire this medical service."

2. John and Mary Smith are assumed names for the plaintiffs. To protect the plaintiffs' anonymity and by agreement of the parties, the court entered a protective order which, among other things, directs that all pleadings, motions or other court records be filed and maintained in the pseudonyms Mary and John Smith.

3. Lifchez is engaged in the practice of fertility and reproductive endocrinology and is also a Clinical Assistant Professor at the University of Chicago Pritzker School of Medicine. Lifchez is also a diplomate of the American Board of Obstetrics and Gynecology and a fellow of the American College of Obstetrics and Gynecology and the American Fertility Society. He has researched and published several articles in the field of fertility.

4. Lifchez describes in vitro fertilization as a six-step procedure. These steps are: (1) surgical removal of mature ovum or ova from the female ovary; (2) examination of the fluid removed from the ovary to confirm the presence of a mature ovum or ova; (3) placement of the mature ovum in a nourishing medium; (4) introduction of a specimen of the husband's semen into the medium in a manner that encourages fertilization; (5) incubation of the fertilized ovum ("conceptus") for several days in an environment that duplicates the female body (during this time period, the conceptus is observed to determine if it is dividing normally); and (6) reimplantation of the conceptus in the woman's uterus after several days. Lifchez also states that a conceptus will not be reimplanted if severe problems in cell division are determined after fertilization because the conceptus will not survive and would likely abort spontaneously. The in vitro fertilization process requires the participation of a team of specially trained physicians and technicians. Different individuals perform various aspects of the process and no individual is necessarily involved in every step.

**160**

alty to participation in the performance of a lawful pregnancy termination.

Ill.Rev.Stat. ch. 38, § 81–26(7) (1981) (the "in vitro provision").[5]

Plaintiffs argue that this court must declare that the in vitro provision is unconstitutional because it violates the first, fourth, ninth and fourteenth amendments. This argument is based upon two general contentions:[6] the in vitro provision violates the plaintiffs' fundamental right to privacy and the in vitro provision is void for vagueness. With respect to their privacy right argument, plaintiffs maintain that several Supreme Court decisions establish certain principles concerning protected privacy interests. Relying on these principles, plaintiffs contend that the in vitro provision impermissibly infringes on their privacy interests because the provision prevents them from effectuating their only hope for conceiving a child. Plaintiffs also raise several matters which they contend are inadequately defined in the in vitro provision. Their attack focuses on the in vitro provision's imposition of custodian status on those who perform the fertilization. Plaintiffs contend that the nature of the custody is "wholly open-ended" and not defined in the statute or case law. Specifically, plaintiffs maintain that it cannot be determined ex-

actly who in the in vitro process has custody because the in vitro provision fails to recognize the team nature of the process. Plaintiffs also complain of the in vitro provision's use of the term "causes" fertilization because it is unclear who within the medical team causes fertilization. In addition, plaintiffs contend that the in vitro provision does not define how long the custody status continues. Finally, plaintiffs argue that the in vitro provision provides no standard of conduct governing those who have custody. For these reasons, plaintiffs contend that the in vitro provision fails to give Lifchez and other health care providers adequate notice of prohibited conduct and that it therefore should be struck down.

In response to this attack on the in vitro provision, the defendants[7] contend that plaintiffs have misconstrued the statute and that when it is given a fair and complete reading, the in vitro provision is not vague and does not burden the plaintiffs' rights. Indeed, defendants state that "[t]he attempt to conceive and bear a child using the procedure and under the circumstances described in the complaint and supporting documents is entirely permissible under Illinois law." Def. Mem. at 2.[8] Defendants conclude, then, that the court should dismiss

**5.** Section 4 of the Act to Prevent and Punish Wrongs to Children provides:

It shall be unlawful for any person having the care or custody of any child, wilfully to cause or permit the life of such child to be endangered, or the health of such child to be injured, or wilfully cause or permit such child to be placed in such a situation that its life or health may be endangered.

Ill.Rev.Stat. ch. 23, § 2354 (1981).

In addition, the term "human being" is defined in section 2(8) of the Act. It "means the individual from fertilization until death". Ill.Rev.Stat. ch. 38, § 81–22(8) (1981).

**6.** Throughout their arguments, plaintiffs contend that a strict scrutiny standard of review must be applied because the in vitro provision directly interferes with plaintiffs' privacy rights and because it imposes restrictions that did not already exist concerning in vitro fertilization. See Charles v. Carey, 627 F.2d 772, 777 (7th Cir.1980). Under this standard of review, plaintiffs urge, if a law impinges upon a fundamental right explicitly or implicitly secured by the Constitution, the law is presumptively unconstitutional. Further, the law can be justi-

fied only by a compelling state interest and it must be narrowly drawn to express only the legitimate interests at stake. See id.

**7.** The defendants named in the complaint are Tyrone C. Fahner, Attorney General of the State of Illinois, and Richard M. Daley, State's Attorney of Cook County, Illinois. Both defendants are sued in their official capacities only. Since Neil F. Hartigan is now the Illinois Attorney General, the court has substituted him as defendant instead of Tyrone C. Fahner. See Fed.R.Civ.P. 25(d).

**8.** "Def. Mem." refers to Defendant Daley's Memorandum in Opposition to Plaintiff's Consolidated Motions filed on October 13, 1982. Defendant Hartigan "incorporate[d] by reference" the memorandum of his co-defendant as his memorandum in opposition to plaintiffs' motion for summary judgment. Thus, the court attributes to both defendants the representations and arguments made in the one memorandum.

the complaint for lack of subject matter jurisdiction because the plaintiffs fail to present a justiciable case or controversy. Def. Mem. at 2.[9]

With respect to plaintiffs' privacy arguments, defendants state that "plaintiffs' situation presents the 'strongest case for a fundamental right to [in vitro fertilization]' ". Def. Mem. at 25 (citation omitted). However, because defendants conclude that the in vitro provision does not apply to plaintiffs, defendants argue that plaintiffs have no standing to attack the statute and it is unnecessary to address the issue of whether plaintiffs have a fundamental right to employ in vitro fertilization for procreative purposes. The defendants' conclusion that the in vitro provision does not apply to these plaintiffs is dependent upon the defendants' interpretation of the statute presented in their response to plaintiffs' vagueness arguments.

Briefly summarized, the defendants' interpretation of the in vitro provision is as follows. Defendants contend that the provision is meant to harmonize several different rights and interests. It both permits in vitro fertilization and preserves the constitutional rights of women who have become pregnant either naturally or through in vitro fertilization to terminate their pregnancies. At the same time, the in vitro provision "protects the State's interest in human life by prohibiting wilful exposure of embryos to harm, [such] as by destructive laboratory experimentation." Def. Mem. at 9. Defendants submit that the only duty imposed by the provision is to refrain from wilfully endangering or injuring a conceptus. They argue that this duty is not impermissibly vague because of several limitations on that duty. First, the duty contains a scienter requirement since any offending party must "wilfully" endanger or injure. Second, the duty is temporally limited because, according to defendants, reasonable statutory construction compels the conclusion that the duty ceases with the reimplan-

tation of the conceptus. Third, the duty does not lack a standard of care because the plain language of the statute and relevant case law support the conclusion that only "wilful abuse, mutilation, or extermination of the conceptus by a person subject to the in vitro provision would be actionable." Def. Mem. at 20. Fourth, the class of persons upon whom the duty is imposed is limited by a scienter requirement, *i.e.*, those who "intentionally" cause fertilization. Finally, the entire in vitro provision is limited by a savings clause which provides that no penalty will attach to participation in the performance of a lawful pregnancy termination. Defendants state that this clause "saves the right to decline to reimplant an embryo under appropriate circumstances...." Def. Mem. at 21–22. In this respect, defendants maintain that " 'pregnancy termination' can only refer to non-reimplantation of an embryo conceived in vitro with the intention of continuing the pregnancy in the womb, until delivery." Def. Mem. at 24. Based on that construction of the statute, defendants conclude that "to determine that [a] five-to-seven day old, non-viable conceptus should not be reimplanted for any medical reason whatsoever is simply to participate in a lawful pregnancy termination." Def. Mem. at 26. With these interpretations of the statute and the plaintiffs' description of the in vitro fertilization process to be used, defendants submit that there are no rights in conflict here and that the in vitro provision "does not fetter the plaintiffs' freedom to engage in the procedure they describe...." Def. Mem. at 31–32. Therefore, defendants contend that plaintiffs lack standing to challenge the in vitro provision and that the court should dismiss this action as failing to present a case or controversy under article III of the Constitution.

As a threshold matter the court must address the contention that plaintiffs lack standing in this case, because if they do, no further issues need be addressed.

---

**9.** Defendants also conclude that plaintiffs lack standing to challenge the in vitro provision.

Def. Mem. at 25, 32.

**162**

This issue, however, is not difficult to resolve. The plaintiffs' pleadings clearly set forth sufficient allegations concerning an adversary stake, injury in fact and assertion of personal rights to meet the tests of *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Thus, the plaintiffs are proper parties to raise the constitutional challenge here. The more critical issue to resolve is whether their challenge presents a case or controversy under article III of the Constitution in light of defendants' interpretation of the in vitro provision because the judicial power of this court as defined in article III "is not an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments . . . 'is legitimate only in the last resort, and as a necessity in the determination of [a] real, earnest and vital controversy.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citation omitted).

■ In determining whether there is a true case or controversy in a constitutional challenge to a state statute, the court must "consider any limiting construction that a state court or enforcement agency has proffered. *Grayned v. City of Rockford,* 408 U.S. 104, 110 [92 S.Ct. 2294, 2299, 33 L.Ed.2d 222] (1972)". *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982); *see also Bellotti v. Baird,* 428 U.S. 132, 143, 96 S.Ct. 2857, 2864, 49 L.Ed.2d 844 (1976). Further, while a plaintiff may seek "federal declaratory relief . . . when no state prose-

cution is pending [if the] plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute," *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1224, 39 L.Ed.2d 505 (1974), "the mere existence of a state penal statute [is an] insufficient ground[ ] to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials if real threat of enforcement is wanting. If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not . . . an adversary case [under article III of the Constitution]." *Poe v. Ullman,* 367 U.S. 497, 507, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961) (citation omitted). *See also Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298–99, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *Delaware Women's Health Organ., Inc. v. Wier,* 441 F.Supp. 497 (D.Del.1977).

■ Examining the alleged controversy in this case, it is clear that the in vitro provision does not prohibit absolutely the act of causing in vitro fertilization. When it is argued that in vitro fertilization is prohibited for the Smiths, it is so only because their physician will not perform the procedure because of what he perceives to be a threat of prosecution under the State's regulation of that process.[10] Upon legal advice, this continues to be Lifchez' position[11] even though: the Cook County State's Attorney ("State's Attorney") answered the complaint "stat[ing] affirmatively that he has never initiated or pursued a prosecution under the challenged provision, and that he has no present intention to initiate or pursue any such prosecution. . . ." Daley Answ. ¶ 8; the State's Attorney provided the legal basis for this

---

**10.** This alleged chilling effect on a physician's willingness to perform the procedure is different from that discussed in *Colautti v. Franklin,* 439 U.S. 379, 396, 99 S.Ct. 675, 686, 58 L.Ed.2d 596 (1979). In that case the chilling effect resulted from the inclusion of the concept of viability within an abortion statute and the inability to define that term in light of disagreement among medical experts. Here, the in vitro procedure to be followed has been identified

and the State now says that the procedure is not prohibited by the Act.

**11.** In a supplemental pleading, plaintiffs have submitted the affidavits of three other physicians who have taken the same position as Lifchez. However, in response to the pleading, defendants have submitted an exhibit which indicates that a hospital in Chicago, Illinois commenced an in vitro fertilization program on January 1, 1983.

answer in a memorandum, which was also adopted by the Illinois Attorney General, opposing the relief sought by plaintiffs; and the defendants agreed to class certification thereby rendering their position effective towards not only these individual plaintiffs, but also towards all others similarly situated.

The plaintiffs argue that the defendants' position is only a legal argument which is both incorrect and not binding on defendants.[12] The court, however, does not accept that view of defendants' pleadings. These defendants are charged with the constitutional and statutory responsibility of enforcing and initially interpreting the laws of Illinois. Ill. Const. art. V, § 15; Ill.Rev. Stat. ch. 14, §§ 4 and 5. Moreover, the Illinois Attorney General is specifically charged with the duty of rendering written opinions upon "constitutional and legal questions". Ill.Rev.Stat. ch. 14, § 4. Although these opinions do not have the binding force of law, there is a long history of their use in this State which suggests that they are far more than the personal reflections of the current office holder. Indeed, the opinions can have collateral effects for state officers who rely on or ignore them and the opinions are accorded considerable weight in the courts when a question of first impression is raised regarding the construction of an Illinois statute. While the Attorney General's views presented here are not in the form of a written opinion issued pursuant to Ill.Rev.Stat. ch. 14, § 4, they are given in response to a vigorous constitutional challenge in federal court and they will be accorded considerable weight by this court. *See generally City of Springfield v. Allphin,* 74 Ill.2d 117, 23 Ill.Dec. 516, 522, 384 N.E.2d 310, 316 (1978); Scott, *The Role of Attorney General's Opinions in Illinois,* 67 Nw.U.L.Rev. 643 (1972).

There are currently no Illinois court decisions interpreting the in vitro provision and, furthermore, the defendants' interpretation of the provision involves in part the interpretation of other Illinois statutory and case law. In these circumstances, the court cannot turn from nor disregard the defendants' interpretation of the statute, especially since that interpretation "might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976). Adoption of defendants' construction of the statute provides several significant limitations on the scope of the in vitro provision. Defendants interpret the period of time for which "care and custody" are imposed by the provision to end when the conceptus is reimplanted. Thus, according to defendants, all responsibilities attending the "care and custody" status are terminated when the conceptus is reimplanted. Further, defendants state that if a conceptus is not reimplanted for medical reasons, such a non-reimplantation would be a lawful pregnancy termination and therefore would not be punishable under the Act to Prevent and Punish Wrongs to Children. Most critically, defendants represent, based on their interpretation, that the in vitro procedure plaintiffs wish to follow does not violate the statute so that no prosecution need be feared. Thus, the only potential issue raised for these plaintiffs under defendants' construction of the statute concerns the use of the technique of superovulation [13] to fertilize of multiple embryos. Defendants suggest that the legal issues surrounding multiple fertilizations are complicated, but defendants do not consider those issues relevant here because plaintiffs do not indicate that the superovulation technique will be used by them for the achievement of multiple fertilizations. Def. Mem. 7–8. In reply, plaintiffs merely state that Lifchez' affidavit neither excludes nor includes a procedure using multiple fertilizations. On this state of the pleadings the court concludes that this issue is not before it.

---

12. In addition, plaintiffs assert that the defendants have consistently declined to agree to entry of a preliminary injunction and have not offered to agree to entry of a declaratory judgment.

13. Superovulation is a procedure designed to produce multiple ova. It involves the administration of hormones.

Under the circumstances of this case on this record, the court agrees with defendants that it would be inappropriate for this court to render any decision on the constitutionality of the in vitro provision at this time.[14] Accepting defendants' interpretation of the statute and their conclusion that the procedure plaintiffs wish to use is not prohibited by the statute and relying on defendants' representation that plaintiffs will not be prosecuted if they proceed with in vitro fertilization according to the procedure set forth by Lifchez, the court concludes that a case or controversy does not exist here.

Accordingly, plaintiffs' consolidated motions for preliminary and permanent injunctive relief and for summary judgment are denied and this cause is dismissed for lack of subject matter jurisdiction.

14. Whether this case is an appropriate one for the application of the doctrine of abstention remains an unaddressed issue for neither defendant has favored the court with such a motion and the court declines to address the matter sua sponte. *See generally Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Wynn v. Scott,* 449 F.Supp. 1302 (N.D. Ill.1978), *aff'd sub nom., Wynn v. Carey,* 599 F.2d 193 (7th Cir.1979).