749 F.2d 452
 Allan G. CHARLES, M.D., et al., Plaintiffs-Appellees/Cross-Appellants,
v.
Richard M. DALEY, et al., Defendants-Appellants/Cross-Appellees,
Eugene F. Diamond, M.D., et al., Intervening
Defendants-Appellants/Cross- Appellees.
The HOPE CLINIC FOR WOMEN, LTD., et al., Plaintiffs-Appellees,
v.
Richard M. DALEY, et al., Defendants-Appellants,
Eugene F. Diamond, M.D., et al., Intervening Defendants-Appellants.
 Nos. 83-3175 to 83-3177 and 83-3253.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 19, 1984.
Decided Nov. 30, 1984.
 
 R. Peter Carey, Mandel, Lipton & Stevenson, Ltd., Chicago, Ill., for plaintiffs-appellees/cross-appellants.
 Maura K. Quinlan, AUL, Legal Defense Fund, Chicago, Ill., for defendants-appellants/cross-appellees.
 Before WOOD, Circuit Judge, PELL, Senior Circuit Judge, and CAMPBELL, Senior District Judge.*
 PELL, Senior Circuit Judge.
 
 
 1
 This case confronts the court with the review of cross-motions for summary judgment. Defendants Richard M. Daley, Illinois State's Attorney, et al., and intervening defendants Dr. Eugene F. Diamond and Dr. Jasper F. Williams appeal from the district court's grant of a permanent injunction against the enforcement of three sections of the Illinois Abortion Law.[1] Defendants and intervening defendants also appeal from the district court's grant of plaintiffs' motion to strike intervening defendants' Exhibit 2, which intervening defendants affixed to their motion for summary judgment. Intervening defendants' Exhibit 2 contained excerpts from a newspaper series entitled The Abortion Profiteers.
 
 
 2
 Plaintiffs Dr. Allan G. Charles, et al., and The Hope Clinic for Women, Ltd., et al., appeal from the district court's denial of their motion for a permanent injunction against the enforcement of section 6(1) of the Illinois Abortion Law. The district court declined to enjoin section 6(1) because the court found that a recent amendment to the Abortion Law, which section 6(1) incorporated, removed section 6(1)'s constitutional infirmities.
 
 
 3
 Section 6(1), along with section 6(4), was the subject of a preliminary injunction entered by then District Judge Joel Flaum on November 16, 1979. Judge Flaum enjoined these sections because they incorporated an unconstitutional definition of viability. Judge Flaum declined to enter a preliminary injunction against sections 2(10) and 11(d).
 
 
 4
 Plaintiffs appealed Judge Flaum's denial of a preliminary injunction with respect to sections 2(10) and 11(d) to this court. This court disagreed with Judge Flaum and found plaintiffs entitled to a preliminary injunction of these sections. Charles v. Carey, 627 F.2d 772, 789-90 (7th Cir.1980). This court ruled that the sections failed to pass constitutional muster because the sections forced physicians "to act as the mouthpiece for the State's theory of life." Id.
 
 
 5
 Plaintiffs moved for summary judgment on the basis of these preliminary injunctions and sought the entry of a permanent injunction against sections 6(1), 6(4), 2(10) and 11(d). Defendants and intervening defendants also sought summary judgment on the basis that the preliminary injunctions against these sections were erroneously entered. As previously noted, Judge Kocoras of the District Court granted plaintiffs' motion for a permanent injunction against the enforcement of sections 6(4), 2(10) and 11(d). Judge Kocoras granted defendants' and intervening defendants' motion for summary judgment with respect to section 6(1). Judge Kocoras furthermore struck intervening defendants' Exhibit 2, which intervening defendants submitted in support of their motion for summary judgment. These rulings by the district court form the basis of this appeal.
 
 I. THE STATUTE
 A. Section 6(1)
 
 6
 Section 6(1) of the Illinois Abortion Law of 1975, as amended by S.B. 47, S.B. 666 and H.B. 1399[2] imposes a standard of care on physicians who perform abortions on a viable fetus. Section 6(1), as it existed at the time plaintiffs, defendants and intervening defendants moved for summary judgment, read as follows:
 
 
 7
 No person who intentionally terminates a pregnancy after the fetus is known to be viable shall intentionally fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted. Any physician or person assisting in such a pregnancy termination who shall intentionally fail to take such measures to encourage or to sustain the life of a fetus known to be viable, before or after birth, commits a Class 2 felony if the death of a viable fetus or infant results from such failure.
 
 
 8
 ILL.REV.STAT. ch. 38, p 81-26 (1983). On September 17, 1983, the Illinois legislature amended its definition of viability and incorporated this amendment into section 6(1). The amendment made viability a subjective determination based on the medical judgment of the attending physician. Judge Kocoras evaluated section 6(1) with reference to this intervening amendment.
 
 
 9
 On June 30, 1984, the Illinois legislature amended section 6(1) again. This recent amendment substantially transformed section 6(1). The amendment is the subject of a temporary restraining order entered by the Northern District of Illinois in Keith v. Daley, No. 84 C 5602 (N.D.Ill.1984), a separate lawsuit. This court accordingly declines to discuss the constitutionality of the 1984 amendment.
 
 B. Section 6(4)
 
 10
 Section 6(4) of the statute, as amended, imposes a similar standard of care on physicians performing abortions on a possibly viable fetus. When plaintiffs, defendants and intervening defendants filed their motions for summary judgment in the district court, section 6(4) read, in pertinent part:
 
 
 11
 No person who intentionally terminates a pregnancy shall intentionally fail to exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted when there exists, in the medical judgment of the physician performing the pregnancy termination based on the particular facts of the case before him, a possibility known to him of more than momentary survival of the fetus, apart from the body of the mother, with or without artificial support.
 
 
 12
 ILL.REV.STAT. ch. 38, p 81-26 (1983). District Judge Kocoras permanently enjoined section 6(4) despite the 1983 amendment to the statute's definition of viability, which section 6(4) incorporated. In 1984, H.B. 1399 substantially altered section 6(4). Because this amendment to section 6(4) is also the subject of the temporary restraining order entered in Keith v. Daley, No. 84 C 5602 (N.D.Ill.1984), this court declines to evaluate its constitutionality.
 
 C. Sections 2(10) and 11(d)
 
 13
 Section 2(10) of the Illinois Abortion Law of 1975, as amended by S.B. 47, defines an "abortifacient" method of birth control. Section 11(d) of that statute requires a physician who prescribes an "abortifacient" method of birth control to inform his patient that he has done so. The Illinois legislature enacted these sections as follows:
 
 
 14
 Sec. 2(10). "Abortifacient" means any instrument, medicine, drug or any other substance or device which is known to cause fetal death when employed in the usual and customary use for which it is manufactured, whether or not the fetus is known to exist when such substance or device is employed.
 
 
 15
 Sec. 11(d). Any person who sells any drug, medicine, instrument, or other substance which he knows to be an abortifacient and which is in fact an abortifacient, unless upon prescription of a physician, is guilty of a Class B misdemeanor. Any person who prescribes or administers any instrument, medicine, drug or other substance or device, which he knows to be an abortifacient, and intentionally, knowingly, or recklessly fails to inform the person for whom it is prescribed or upon whom it is administered that it is an abortifacient commits a Class C misdemeanor.
 
 
 16
 ILL.REV.STAT. ch. 83, paragraphs 81-22, 81-31 (1983). Unlike sections 6(1) and 6(4), sections 2(10) and 11(d) are not the subject of recent amendment, and are not before the district court in Keith v. Daley, supra. This court will accordingly address the constitutionality of these sections in their current form.
 
 II. MOOTNESS
 
 17
 Before reaching the constitutionality of sections 6(1), 6(4), 2(10) and 11(d), however, this court must address the issue of mootness. During oral argument before this court, intervening defendants suggested for the first time that plaintiffs' constitutional challenges to sections 6(1) and 6(4) were moot. Intervening defendants based their mootness argument on the fact that the Illinois legislature had amended both sections during the pendency of this appeal. Because H.B. 1399 and its amended sections 6(1) and 6(4) superseded the versions of those sections reflected in S.B. 47, intervening defendants argue that these superseded versions cannot threaten the exercise of plaintiffs' constitutional rights. Consequently, intervening defendants contend, the constitutionality of S.B. 47's version of sections 6(1) and 6(4) is not a live controversy. Intervening defendants therefore assert that this court is without power to review them.
 
 
 18
 The concept of mootness, indeed, defines constitutionally minimal conditions for the invocation of federal judicial power. Franks v. Bowman Transportation Co., 424 U.S. 747, 754, 96 S.Ct. 1251, 1259, 47 L.Ed.2d 444 (1976). Moreover, a moot case does not present a "case or controversy" within the meaning of Article III. See Geraghty v. United States Parole Commission, 579 F.2d 238, 245 (3d Cir.1978) (extensive discussion of the mootness doctrine), vacated on other grounds, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). However, the determination of which cases survive the limitations imposed by the mootness doctrine and which cases do not is not a facile endeavor. As this court recently observed in Commodity Futures Trading Commission v. Board of Trade, 701 F.2d 653, 655 (7th Cir.1983):
 
 
 19
 Although mootness is sometimes painted in black and white--"federal courts are without power to decide questions that cannot affect the rights of the litigants in the case before them," ... it really should be painted in shades of gray since few controversies are wholly beyond the power of changed circumstances to revive....
 
 
 20
 (Citing North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).) This court, accordingly, shall examine the mootness issue in this case with awareness that our determination must respect the "fundamental policies informing the 'cases or controversies' limitation imposed by Article III." Franks v. Bowman Transportation Co., 424 U.S. at 754, 96 S.Ct. at 1259. In addition, this court acknowledges that a defendant alleging mootness carries a heavy burden of persuasion. See United States v. Phosphate Export Association, Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); Sanchez v. Edgar, 710 F.2d 1292, 1294-95 (7th Cir.1983); Halet v. Wend Investment Co., 672 F.2d 1305, 1308 (9th Cir.1982).
 
 A. Section 6(1)
 
 21
 Section 6(1) of S.B. 47 was the subject of a preliminary injunction entered by Judge Flaum on November 16, 1979. Judge Kocoras refused to make this injunction permanent with respect to section 6(1), however, because he believed that an intervening amendment to the section's definition of viability removed its constitutional infirmities. As a result, the S.B. 47 version of section 6(1) remained in effect from October 14, 1983, the date of Judge Kocoras' decision, until June 30, 1984, the date H.B. 1399 superseded S.B. 47.
 
 
 22
 S.B. 47 made the violation of section 6(1) a Class 2 felony if the death of a viable fetus or infant occurred as the result of an abortion. ILL.REV.STAT. ch. 38, p 81-26 (1983). The statute of limitations for such Class 2 felonies allows the State a period of three years from the date of the offense within which to commence prosecution. ILL.REV.STAT. ch. 38, p 3-5 (1983). This three year period is still running with respect to violations of section 6(1) which occurred between October 14, 1983, and June 30, 1984. Thus, the State of Illinois could prosecute plaintiffs for violation of S.B. 47's section 6(1) if plaintiffs violated that section while it remained in effect.
 
 
 23
 We find this possibility insufficiently speculative to render plaintiffs' challenge to the S.B. 47 version of section 6(1) moot. Defendants and intervening defendants have offered no evidence to rebut this possibility of prosecution. As a result, this court finds plaintiffs' challenge to S.B. 47's section 6(1) a live controversy within the meaning of Article III.
 
 B. Section 6(4)
 
 24
 Judge Flaum preliminarily enjoined the enforcement of S.B. 47's section 6(4) on November 16, 1979. Judge Kocoras made this injunction permanent approximately four years later. Judge Kocoras did not believe that the statute's amended definition of viability could salvage section 6(4) because section 6(4) continued to regulate pre-viability abortions.
 
 
 25
 Unlike section 6(1), section 6(4) has been subject to continuous injunction since plaintiffs' initial challenge to its constitutionality in 1979. Thus, this court's mootness analysis with respect to section 6(1) is inapposite to the alleged mootness of section 6(4). Nevertheless, this court finds that plaintiffs' challenges to both sections present live controversies despite the intervening amendments to these sections reflected in H.B. 1399.
 
 
 26
 The State's revision of section 6(4) pending this appeal implicates a well-known line of mootness cases.[3] See, e.g., City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); Quern v. Mandley, 436 U.S. 725, 98 S.Ct. 2068, 54 L.Ed.2d 658 (1978); United States v. Phosphate Export Association, Inc., 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). This line of cases focuses on a defendant's voluntary abandonment of conduct challenged by a plaintiff. Many of these cases involve revisions to allegedly illegal procedures, ordinances or statutes pending a plaintiff's appeal. By revising their allegedly illegal measures, defendants in these cases seek to moot plaintiffs' appeals.
 
 
 27
 A recent example of such voluntary abandonment confronted the Supreme Court in City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). In that case, plaintiff Aladdin's Castle contended that a municipal zoning ordinance was unconstitutionally vague. During the pendency of plaintiff's appeal, defendant city revised the ordinance and removed its objectionable language. The Supreme Court held that this revision did not moot plaintiff's appeal. Id. 455 U.S. at 289, 102 S.Ct. at 1074. The Supreme Court observed, in so holding:
 
 
 28
 The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did the courts would be compelled to leave "[t]he defendant ... free to return to his old ways."
 
 
 29
 Id. at 289 n. 10, 102 S.Ct. at 1074 n. 10 (citing United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).
 
 
 30
 Like the defendant city in Aladdin's Castle, the State of Illinois could re-enact S.B. 47's version of section 6(4) if this court dismissed plaintiffs' challenge to that section. Indeed, the very number of amendments made to the challenged statute in the last several years persuades this court that such a result would not be unlikely. Moreover, the history of the Abortion Law suggests that the State has attempted repeatedly to alter the contours of that statute to reflect the latest judicial pronouncements in the area of abortion and privacy. As a result, defendants and intervening defendants have failed to prove to this court that the State will not "return to its old ways" if the court dismisses plaintiffs' claim.
 
 
 31
 In addition, defendants and intervening defendants have not demonstrated that H.B. 1399 irrevocably eradicated the effects of the challenged version of section 6(4). Defendants and intervening defendants have not demonstrated, for example, that any chilling effects caused by that section no longer exist. Recent Supreme Court cases dealing with the mootness issue suggest that such eradication is an additional prerequisite to mootness. See City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); County of Los Angeles v. Davis, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). Consequently, defendants and intervening defendants have not convinced this court that plaintiffs' challenge to section 6(4) is moot. The court will address the constitutionality of each of the challenged sections in turn.
 
 III. CONSTITUTIONAL ANALYSIS
 
 32
 In its seminal opinion in the case of Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), the Supreme Court decided that a woman's fundamental right of privacy, which derived from the Fourteenth Amendment's concept of personal liberty, encompassed a woman's decision whether to terminate her pregnancy. Earlier opinions by the Court had established that a woman's right of privacy encompassed her freedom of choice regarding activities related to marriage and contraception. See, e.g., Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). The Roe opinion extended the reasoning of such earlier cases to a woman's decision whether to procure an abortion.
 
 
 33
 In Roe, the Court additionally identified certain interests of the State which competed with the woman's interest in freely choosing abortion. These State interests were the protection of maternal health and the preservation of fetal life. Roe, 410 U.S. at 150, 93 S.Ct. at 725. The State's interest in protecting maternal health became compelling at the end of a woman's first trimester of pregnancy. Id. at 163, 93 S.Ct. at 731. The State's interest in preserving fetal life became compelling at the stage of viability. Id. Prior to the stages at which the State's interests became compelling, the State could not interfere with the woman's decision, in consultation with her physician, to abort her fetus. Id. at 165-66, 93 S.Ct. at 732-733.
 
 
 34
 Cases subsequent to Roe have reaffirmed its analysis. These cases have stricken various attempts by the State to discourage a woman from choosing abortion. See, e.g., Planned Parenthood v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion); Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). At the same time, however, the Supreme Court has acknowledged that the State may encourage alternatives to abortion in ways that do not interfere with a woman's decision. See Williams v. Zbaraz, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980); Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); Poelker v. Doe, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977) (per curiam); Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). The Supreme Court, furthermore, has upheld a requirement that second trimester abortions be performed in a licensed clinic, Simopoulos v. Virginia, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983), and a requirement that parents of immature, dependent minors receive notice of their child's attempt to procure an abortion, H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). This court must evaluate the State of Illinois' attempts to regulate the performance and procurement of abortions in light of the post-Roe decisions.
 
 A. Section 6(1)
 
 35
 Section 6(1) of S.B. 47 imposes a standard of care on physicians and others who assist physicians in the performance of abortions on a viable fetus. That section makes it a Class 2 felony to fail to use the same care in aborting a viable fetus that the physician, or his assistant, would be required to use in bringing a viable fetus to live birth. To be liable under the section, a physician or his assistant must intend to terminate the mother's pregnancy and must intentionally fail to use the requisite degree of care in performing the abortion.
 
 
 36
 Section 6(1) applies when the fetus is "known to be viable." Section 6(1) does not specify, however, which party, physician or assistant, must make this viability determination. Consequently, the section could make criminal an assistant's failure to use the requisite care in aborting a fetus which the assistant, but not the physician, believes in nonviable. In addition, the section could make criminal a physician's failure to observe the required standard of care in situations where some other physician, but not the treating physician, believes that the fetus is viable.
 
 
 37
 This court acknowledges that the State's interest in preserving fetal life is compelling at the stage of viability. See Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 731. The State, therefore, may regulate abortions at or after the stage of viability even if the State's regulations interfere with a woman's fundamental right to choose abortion.[4] However, the State may only regulate in such a context if it narrowly tailors its regulations to the precise State interest at stake. Roe, 410 U.S. at 165, 93 S.Ct. at 732.
 
 
 38
 Moreover, in serving its compelling interest, the State must respect the physician's central role in consulting with the woman and in determining how to carry out her abortion. See Colautti v. Franklin, 439 U.S. at 387, 99 S.Ct. at 681. In particular, the State may not interfere with the attending physician's medical judgment in determining the precise point in a woman's pregnancy at which viability exists. Id. 439 U.S. at 395-96, 99 S.Ct. at 685-86. "[T]he determination of whether a particular fetus is viable is, and must be, a matter for the responsible attending physician." Planned Parenthood v. Danforth, 428 U.S. at 64, 96 S.Ct. at 2839. Because section 6(1) does not specify that the attending physician's viability determination alone shall govern, section 6(1) improperly encroaches on the attending physician's medical judgment in treating his patient.
 
 
 39
 This court does not hold that the State may never prescribe standards of care to physicians, or their assistants, who perform abortions on a fetus which has attained viability. Rather, this court holds that when the State prescribes such standards, it must afford due deference to the conclusive viability determination of the attending physician. In addition, the State must precisely tailor its standards of care to the particular State interest at stake so that its statute precisely notifies physicians and their assistants as to what conduct by them the State purports to condemn. Section 6(1) fails to give physicians and their assistants such explicit notice. Under these circumstances, the State must proceed with greater precision before it may subject a physician, or his assistant, to criminal sanction. Colautti v. Franklin, 439 U.S. at 400-01, 99 S.Ct. at 688.
 
 
 40
 Where a vague statute "abuts upon" the exercise of fundamental rights, the statute "operates to inhibit the exercise of such freedoms." Planned Parenthood Association v. Fitzpatrick, 401 F.Supp. 554, 571 (E.D.Pa.1975) (citing Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972)), aff'd sub nom. Franklin v. Fitzpatrick, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). Because this section abuts upon a woman's fundamental right to consult her doctor about abortion and to receive her doctor's unimpeded medical judgment, it threatens to chill the exercise of her freedom. Specifically, the section encumbers the woman's exercise of a constitutionally protected right by placing obstacles in the form of criminal sanctions in the path of the doctor upon whom she is entitled to rely for advice. Akron Center For Reproductive Health, Inc. v. City of Akron, 479 F.Supp. 1172, 1198 (N.D.Ohio 1979) (citing Whalen v. Roe, 429 U.S. 589, 604, 97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977)), aff'd in part and rev'd in part, 651 F.2d 1198 (6th Cir.1981), aff'd in part and rev'd in part, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). The section imprecisely informs physicians and their assistants as to what conduct by them the State prohibits. The section, therefore, threatens to chill the exercise of a physician's best medical judgment in consulting with his patients about abortion. The State has failed to reflect precisely its compelling post-viability interests by drafting a statute affording physicians, and their assistants, due notice before the State subjects them to criminal sanction. As a result, this court finds section 6(1) unconstitutionally vague.[5]
 
 B. Section 6(4)
 
 41
 Section 6(4) of S.B. 47 imposes a similar standard of care on physicians and their assistants who perform abortions on a possibly viable fetus. Section 6(4) makes it a Class 3 felony to fail to observe the same standard of care in aborting a possibly viable fetus that the physician, or his assistant, would be required to observe in bringing a possibly viable fetus to live birth. Like section 6(1), criminal liability under section 6(4) requires that the physician or his assistant intend to terminate the mother's pregnancy, and that the physician or his assistant intentionally fail to observe the required standard of care.
 
 
 42
 Unlike section 6(1), however, section 6(4) purports to regulate not only the abortion of a viable fetus, but also the abortion of a fetus which is potentially viable. Thus, section 6(4) purports to regulate the performance of abortions at a stage prior to viability. As Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 731, makes clear, the State's interest in preserving fetal life is not compelling before the viability stage. As a result, the State must present a different compelling interest to justify the direct interference with a woman's freedom to choose an abortion that section 6(4) represents.
 
 
 43
 In particular, section 6(4) creates a direct interference with a woman's right to discuss abortion with her physician and to receive her physician's unimpeded medical judgment because section 6(4) places obstacles in the form of criminal sanctions in the path of the physician upon whom she is entitled to rely for advice. See Akron Center For Reproductive Health, Inc. v. City of Akron, 479 F.Supp. at 1198. Intervening defendants claim that the section creates no interference with the woman's right to choose abortion because the section penalizes only hostile activity toward the fetus unrelated to the exercise of the woman's privacy right. This contention ignores, however, the possibility that the woman will be unable to exercise her privacy right because her doctor refuses to perform an abortion at the risk of inducing a criminal sanction.
 
 
 44
 This court finds that such a possibility significantly burdens a woman's right to terminate her pregnancy. Because section 6(4) creates such a burden, the State must justify it by means of a compelling interest and must prove that it has tailored section 6(4) narrowly to protect only the legitimate State interest at stake. Carey v. Population Services International, 431 U.S. 678, 688, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977) (citing Roe v. Wade, 410 U.S. at 155, 93 S.Ct. at 727). The Supreme Court has recognized two such compelling interests that may justify a restriction of the right to choose abortion. City of Akron v. Akron Center For Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, at 2491, 76 L.Ed.2d 687. One of these compelling interests, the State's interest in preserving fetal life, becomes compelling only at the stage of viability. Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 731. As a consequence, the State's interest in preserving fetal life cannot justify section 6(4) because section 6(4) applies to certain pre-viability abortions.
 
 
 45
 The second compelling State interest recognized by the Supreme Court in the area of abortion is the State's legitimate concern with the health of the woman. City of Akron, 103 S.Ct. at 2492. Section 6(4), however, penalizes hostile activity which is harmful to the health of the fetus and does not seek to protect the health of the mother. As a result, the State's legitimate concern with the health of the mother cannot justify section 6(4). Because the State has advanced no other compelling interest which could justify Section 6(4)'s restriction on a woman's freedom to choose an abortion, this court must find that section 6(4) unconstitutionally infringes on the woman's fundamental right. Section 6(4) is therefore invalid.
 
 C. Sections 2(10) and 11(d)
 
 46
 Section 2(10) of S.B. 47 defines an abortifacient as any substance or device which is known to cause fetal death. Section 11(d) of that statute requires physicians who prescribe or administer abortifacients to inform their patients that they have done so. If a physician intentionally, knowingly or recklessly fails to inform his patient that he has prescribed or administered an abortifacient, the physician commits a Class C misdemeanor.
 
 
 47
 Intervening defendants assert that the Illinois legislature passed sections 2(10) and 11(d) in order to protect those women who oppose abortifacient methods of birth control for moral and/or religious reasons. Intervening defendants also assert that the sections do not interfere with a woman's freedom to choose abortion, or her freedom to choose any method of birth control. Rather, intervening defendants contend that the sections merely require physicians to give information to their patients concerning "what will be done [to them] and as to its consequences." Planned Parenthood v. Danforth, 428 U.S. 52, 67 n. 8, 96 S.Ct. 2831, 2840 n. 8, 49 L.Ed.2d 788 (1976).
 
 
 48
 In Danforth, the Supreme Court acknowledged that the State could require such a limited form of informed consent before a woman underwent an abortion. Id. The Court cautioned, however, that a more detailed requirement of informed consent could confine the attending doctor in an undesired and uncomfortable straitjacket in the practice of his profession. Id. The Court later relied upon its cautionary remarks in Danforth to strike down a state's requirement that the physician recite a lengthy and inflexible list of information before his patient could have an abortion. City of Akron v. Akron Center For Reproductive Health, Inc., 103 S.Ct. at 2501. The Court reaffirmed in that later case that the State could not intrude upon the discretion of the pregnant woman's physician. Id. at 2500.
 
 
 49
 The Supreme Court, moreover, has denied the states the power to override the rights of a pregnant woman by adopting one theory of when life begins. Roe v. Wade, 410 U.S. at 162, 93 S.Ct. at 731. See also City of Akron, 103 S.Ct. at 2500. In particular, the Court has prohibited the State from foisting upon the pregnant woman its view that life begins at conception in order to justify its regulation of abortion. City of Akron, 103 S.Ct. at 2500. See also Eubanks v. Collins, 10 Fam.L.Rep. (BNA) 1659 (W.D.Ky. Sept. 11, 1984). This court finds that sections 2(10) and 11(d) constitute such an attempt by the State of Illinois because the sections incorporate a definition of "fetus" in which the State classifies a fetus as a human being from fertilization until death. ILL.REV.STAT. ch. 38, p 81-21 (1983). As this court noted in Charles v. Carey, 627 F.2d 772, 789 (7th Cir.1980), "the use of the term 'abortifacient' in describing certain birth control methods forces the physician to act as the mouthpiece for the State's theory of life."
 
 
 50
 Intervening defendants dispute that the sections require physicians to reiterate the State's theory that life begins at conception. Intervenors assert that, to the contrary, the sections merely require that physicians notify their patients that they are prescribing abortifacients, and not that the abortifacients will kill their patients' unborn children. This assertion ignores both the State's definition of abortifacient, in which the State refers to "fetal death," and the State's definition of "fetus," which this court previously has described. However physicians choose to comply with the mandate of section 11(d), they nevertheless must notify their patients that the drug or device which they have prescribed will terminate the life of any fetus which their patients might be carrying. This section not only intrudes upon the medical discretion of the attending physician, but it also impermissibly imposes the State's theory of when life begins upon the physician's patient.
 
 
 51
 The State cannot justify this intrusion upon the physician-patient relationship by its interest in protecting maternal health or by its interest in preserving fetal life. The State's interest in protecting maternal emotional and physical health cannot justify sections 2(10) and 11(d) because the sections foist upon those women who prefer abortifacient methods of birth control the State's theory that abortifacients cause the death of unborn children. The State may not treat such women inequitably in order to protect the emotional health of women who oppose abortifacients. Likewise, the State's interest in preserving fetal life cannot justify sections 2(10) and 11(d) for two reasons. First, the sections operate in situations where the woman is not even pregnant. Second, when the woman is indeed pregnant, sections 2(10) and 11(d) impermissibly restrict the attending physician's discretion at a stage in the mother's pregnancy at which neither of the State's recognized interests may be compelling. These sections additionally infringe upon a woman's constitutionally protected right of private decision-making in matters relating to contraception, with no countervailing State compelling interest. See Carey v. Population Services International, 431 U.S. at 688-89, 97 S.Ct. at 2017-18. As a result, sections 2(10) and 11(d) are unconstitutional.
 
 IV. EXCLUSION OF EXHIBIT 2
 
 52
 Defendants and intervening defendants contend that the trial court improperly prevented them from demonstrating the existence of such a compelling State interest by the court's exclusion of intervening defendants' Exhibit 2. Exhibit 2 contained excerpts from a Chicago Sun-Times investigative series entitled The Abortion Profiteers. Intervening defendants offered the excerpts in order to prove that the State had reason to fear that doctors in abortion clinics were not acting in their patients' best interests. In particular, intervening defendants sought to prove, by introduction of the excerpts, that doctors in abortion clinics commonly mislead their patients by trivializing the effects of an abortion. Intervening defendants also sought to prove that physicians in such clinics are primarily interested in their own monetary profit to the detriment of their patients' peace of mind. Intervening defendants contend that such abuses by doctors in abortion clinics justify the intrusion upon the physician-patient relationship presented by sections 2(10) and 11(d).
 
 
 53
 The district court excluded the excerpts, noting that proof of the State's interest could not be made by means of a newspaper series. The court preferred evidence of a more factual nature and, therefore, required the State to prove the need for sections 2(10) and 11(d) by evidence other than Exhibit 2.
 
 
 54
 Intervening defendants suggest that the district court thereby erroneously subjected Exhibit 2 to the requirements governing the introduction of adjudicative facts. Intervenors assert that the exhibit contained legislative facts, which need not be indisputable in order for a federal court to admit them into evidence. Intervenors assert that the court below should have considered the legislative facts reflected in their newspaper excerpts so that the court could evaluate properly the constitutionality of the two sections.
 
 
 55
 This court need not characterize the facts reported in the newspaper excerpts as legislative or adjudicative facts in order to review the district court's exclusion of the excerpts from evidence. This court finds the excerpts simply irrelevant to the constitutionality of sections 2(10) and 11(d). The excerpts prove that certain doctors trivialize abortions and prefer monetary gain to preservation of their patients' peace of mind. The excerpts do not prove that Illinois doctors misrepresent the nature of birth control methods which they prescribe for their patients or that Illinois doctors force women opposed to abortifacients to use them. The excerpts reveal no compelling State interest which justifies interference with a physician's medical discretion in consulting with his patient about birth control. Moreover, the excerpts reveal no compelling interest which justifies an attempt by the State to foist upon any woman its theory of life. Whether the facts reported in the Sun-Times series are legislative or adjudicative in nature, this court finds them irrelevant to a constitutional analysis of sections 2(10) and 11(d).
 
 
 56
 Furthermore, this court acknowledges the substantial discretion of a trial judge in ruling on the relevancy of tendered evidence. This court consistently has accorded great deference to the evidentiary decisions of a trial court. United States v. Bouye, 688 F.2d 471, 476 (7th Cir.1982). See also Gorby v. Schneider Tank Lines, Inc., 741 F.2d 1015, 1018 (7th Cir.1984); United States v. Green, 735 F.2d 1018, 1026 (7th Cir.1984); United States v. Sweeney, 688 F.2d 1131, 1144 (7th Cir.1982). This court will not overturn such an evidentiary decision by a trial judge in the absence of a clear abuse of discretion. Gorby v. Schneider Tank Lines, Inc., 741 F.2d at 1018. This court finds no such clear abuse of discretion here. Thus, we defer to the district court's refusal to admit intervenors' Exhibit 2 into evidence.
 
 V. CONCLUSION
 
 57
 The district court found sections 6(4), 2(10) and 11(d) of S.B. 47 unconstitutional and, accordingly, entered a permanent injunction against the enforcement of these sections. This court agrees that the above sections unconstitutionally infringe upon a woman's fundamental privacy right. This court, furthermore, finds section 6(1) of S.B. 47 unconstitutional for the same reason. We therefore AFFIRM the district court's permanent injunction against sections 6(4), 2(10) and 11(d) and REVERSE the district court's judgment with respect to section 6(1). We direct the district court to enter a permanent injunction against the enforcement of section 6(1) on remand.
 
 
 
 *
 William J. Campbell, Senior District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 District Judge Charles Kocoras entered a permanent injunction against the enforcement of sections 6(4), 2(10) and 11(d) of the Illinois Abortion Law of 1975, as amended by S.B. 47 and S.B. 666, on October 14, 1983
 
 
 [2]
 S.B. 47 took effect October 30, 1979
 S.B. 666 took effect September 17, 1983.
 H.B. 1399 took effect June 30, 1984.
 
 
 [3]
 The State's revision of section 6(1) pending this appeal likewise implicates this line of cases. In the case of section 6(1), however, there are additional and more compelling reasons to avoid a mootness holding
 
 
 [4]
 The Roe decision makes clear that a State may even proscribe abortion after the stage of viability, except where abortion is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. Roe, 410 U.S. at 164-65, 93 S.Ct. at 732
 
 
 [5]
 The statute's amended definition of viability, reflected by S.B. 666, does not alter our result, because section 6(1) still fails to inform the physician as to whose viability determination controls