[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 11-11125 & 11-11690
_____

D. C. Docket No. 8:09-cv-02308-RAL-MAP

KEITH STANSELL,
MARC GONZALVES, et al.,

Plaintiffs-Appellees,

versus

REVOLUTIONARY ARMED FORCES OF COLOMBIA,
JUVENAL OVIDIO RICARDO PALMERA PINEDA, et al.,

Defendants-Appellees,

MERCURIO INTERNATIONAL S.A.,

Claimant-Appellant.
_____

Appeals from the United States District Court
for the Middle District of Florida
_____
(January 9, 2013)

Before HULL and BLACK, Circuit Judges, and GOLDBERG,* Judge.

PER CURIAM:

_____

    * Honorable Richard W. Goldberg, United States Court of International Trade
Judge, sitting by designation.

At issue in this case is the meaning of "blocked assets" under § 201 of the Terrorism Risk Insurance Act of 2002 (Terrorism Act), Pub. L. No. 107-297, 116 Stat. 2322.  Specifically, we decide whether assets frozen pursuant only to the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. § 1901 et seq., qualify as "blocked assets" under the Terrorism Act.  Under the plain language of the statute, we hold such assets are not "blocked assets."

## I. BACKGROUND

Between 2003 and 2008, Appellees suffered repeated acts of international terrorism at the hands of the Revolutionary Armed Forces of Colombia (FARC). FARC has long been sanctioned by the United States for its international terrorism and narcotics trafficking activities.[1]  Of particular relevance to this case, FARC has been designated both (1) a "Specially Designated Global Terrorist"[2] under the

---

[1] Although not relevant to this appeal, FARC is designated a Foreign Terrorist Organization under 8 U.S.C. § 1189, which authorizes the Secretary of State "to designate an organization as a foreign terrorist organization . . . if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1).

[2] A "specially designated global terrorist . . . means any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."  31 C.F.R. § 594.310.  Aside from the 27 foreign persons specifically listed in the Annex, Executive Order No. 13224 designated (1) persons determined by the Secretary of the Treasury to act for or on behalf of those persons listed, and (2) persons determined by the Secretary "to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed" or "to be otherwise associated" with those persons.  Executive Order No. 13224 § 1(a), (c), (d)(i)-(ii) Annex., Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism, 66 Fed. Reg. 49079, 49079–82 (Sept. 23, 2001).

International Economic Emergency Powers Act (Economic Powers Act), 50 U.S.C. §§ 1701, 1702, as well as (2) a "Significant Foreign Narcotics Trafficker" (SFNT) under the Kingpin Act.[3]  As a result of these designations, all FARC assets subject to United States jurisdiction are frozen.

In 2009, Appellees sued FARC in the United States District Court for the Middle District of Florida under the civil remedies provisions of the Anti-Terrorism Act, 18 U.S.C. § 2333.  Appellees sought damages from FARC and its leadership for terrorist acts committed while they were held hostage in the jungles of Colombia.  In 2010, Appellees collectively obtained a default judgment against FARC for $318 million in compensatory damages.

Enforcing that judgment against FARC, however, proved difficult.  FARC's assets, to the extent any exist within United States jurisdiction, are well concealed. Nonetheless, because Appellees were victim creditors under their judgment with perfected liens on all proceeds derived from FARC's criminal activities, they began diligently pursuing the assets of FARC associates.

One such alleged FARC associate was a Colombian money exchange house, Mercurio International (Mercurio).  In 2008, the Secretary of the Treasury and the Office of Foreign Assets Control (OFAC) determined that Mercurio had "act[ed]

---

[3] A "'significant foreign narcotics trafficker' means any foreign person that plays a significant role in international narcotics trafficking, that [1] the President has determined to be appropriate for sanctions pursuant to this chapter, and [2] that the President has publicly identified in the report required under" 21 U.S.C. §§ 1903(b) or 1903(h)(1). 21 U.S.C. § 1907(7).

on behalf of and materially assist[ed]" FARC in laundering narcotics proceeds.

Because FARC was sanctioned under the Kingpin Act, OFAC determined

Mercurio should also be sanctioned as a "Specially Designated Narcotics

Trafficker" (SDNTK) under the Kingpin Act and the Foreign Narcotics Kingpin

Sanctions Regulations, 31 C.F.R. § 598.314(b).[4]  As a consequence of OFAC's

designation, all of Mercurio's assets subject to United States jurisdiction were

frozen pursuant to the Kingpin Act.

In an effort to collect their judgment against FARC, Appellees filed a motion

for a Writ of Garnishment in the district court against Mercurio's Kingpin Act

frozen assets.  Appellees argued that, even though Mercurio was not named in the

FARC judgment, its assets could be garnished as the "blocked assets" of an

"agency or instrumentality" of FARC.[5]  In support of that proposition, Appellees

relied on § 201(a) of the Terrorism Act, which provides in relevant part:

> [I]n every case in which a person has obtained a judgment against a
> terrorist party on a claim based upon an act of terrorism . . . the
> blocked assets of that terrorist party (including the blocked assets of
> any agency or instrumentality of that terrorist party) shall be subject to

---

[4] In relevant part, § 598.314(b) defines the term "specially designated narcotics trafficker" to mean "Foreign persons designated by the Secretary of the Treasury . . . because they are found to be . . . [m]aterially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a specially designated narcotics trafficker."  31 C.F.R. § 598.314(b).

[5] *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (concluding that the Terrorism Act allows "post-judgment execution and attachment . . . against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment").

4

execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Terrorism Act § 201(a).

In their motion for garnishment, Appellees alleged all four of § 201(a)'s elements were met: (1) the judgment being enforced was against a terrorist party—FARC; (2) the judgment was based on FARC's acts of terrorism; (3) Mercurio's assets were "blocked assets" within the meaning of the Terrorism Act; and (4) garnishment against Mercurio would partially satisfy an award of compensatory damages.  Essentially, Appellees argued that, because FARC is a judgment-debtor "terrorist party" and Mercurio was designated an SDNTK under the Kingpin Act due to its alleged connection with FARC, Mercurio's assets could be garnished as the "blocked assets" of a "terrorist party."

In 2011, the district court granted ex parte Appellees' motion for a writ of garnishment, reasoning that their claim satisfied all of § 201(a)'s requirements.  In particular, the district court concluded that Mercurio's assets, which were frozen only under the Kingpin Act, constituted "blocked assets" according to the Terrorism Act's definition of that term in § 201(d)(2)(A).  The district court subsequently adopted Appellees' proposed order and issued a writ of garnishment.

After the district court's judgment, but before Appellees were able to execute against the assets, Mercurio filed a motion to dissolve the writ of

5

garnishment.  Mercurio contended OFAC was in the process of rescinding its

SDNTK designation under the Kingpin Act, and asked the court to therefore

reverse its prior judgment.  The district court denied the motion.  Mercurio then

filed a notice of appeal with respect to the garnishment judgment and a motion for

stay pending appeal, which the district court subsequently granted. [6]

## II. STANDARD OF REVIEW

This Court reviews legal questions, including the interpretation of federal

statutes, de novo.  *Halperin v. Reg'l Adjustment Bureau, Inc.*, 206 F.3d 1063, 1066

(11th Cir. 2000).

## III. DISCUSSION

This case focuses solely on the interpretation of § 201(d)(2) of the Terrorism

Act, which defines "blocked assets" for purposes of that statute. [7]  Appellees

contend that Mercurio's assets are "blocked assets" under the Terrorism Act

because the Kingpin Act is historically connected and similar to one of the statutes

expressly listed in § 201(d)(2)(A): the Economic Powers Act.  Appellees claim the

Kingpin Act's history reveals it to be a "sub-species" of the Economic Powers Act.

---

[6] Mercurio also moved the district court to reconsider its garnishment judgment.  But because Mercurio had already appealed to this Court on the garnishment judgment, the district court dismissed the motion for reconsideration without prejudice for lack of jurisdiction.

[7] Under the particular facts of this case, including the district court's ex parte proceeding, the statutory interpretation question was not waived.  The Department of Justice appearing as amicus curiae timely raised the issue, and the interpretation of a statute providing the basis for a cause of action is reviewed de novo.  *See Halperin*, 206 F.3d at 1066.

The Kingpin Act, Appellees contend, was "expressly modeled" on the Economic Powers Act and was "birthed from" that statute's "successful execution."[8] As a result, "an asset seized or frozen 'under the Kingpin Act' is *by definition* an asset seized or frozen under" the Economic Powers Act.

Our analysis must begin with the language of the statute. *Harris v. Garner*, 216 F.3d 970, 972–73 (11th Cir. 2000) (en banc). In general, statutory definitions control the meaning of a statute's terms. *Burgess v. United States*, 553 U.S. 124, 129–30, 128 S. Ct. 1572, 1577 (2008). In pertinent part, § 201(d)(2)(A) defines a "blocked asset" to "mean[] . . . any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act [Trading Act] . . . or under sections 202 and 203 of the International Emergency Economic Powers Act [Economic Powers Act] . . . ." Terrorism Act § 201(d)(2)(A).

The plain language of § 201(d)(2)(A) is unambiguous. The Terrorism Act defines what a "blocked asset" "means," not what the term merely could "include." When a statutory definition declares what a term "means" rather than "includes,"

---

[8] Specifically, Appellees' proffered historical connection proceeds as follows. In 1995, the President issued an Executive Order pursuant to his authority under the Economic Powers Act to address certain "unusual and extraordinary threat[s]." International Emergency Economic Powers Act, 50 U.S.C. § 1701(a). In pertinent part, that Order "declare[d] a national emergency to deal" with "significant foreign narcotics traffickers centered in Colombia." Executive Order No. 12978 of October 21, 1995, Blocking Assets and Prohibiting Transactions With Significant Narcotics Traffickers, 60 Fed. Reg. 54579, 54579 (Oct. 21, 1995). In 1999, Congress enacted the Kingpin Act, which was motivated in part on the Executive Order's successful application of the Economic Powers Act against Colombian narcotics traffickers. H.R. Rep. No. 106-457, at 22, 42–43 (1999) (Conf. Rep.), *reprinted in* 1999 U.S.C.C.A.N. 304, 313–14.

any meaning not stated is excluded. *Colautti v. Franklin*, 439 U.S. 379, 392–93 & n.10, 99 S. Ct. 675, 684 & n.10 (1979). This is because the term "means" denotes an exhaustive definition, while "includes" is merely illustrative. *United States v. Probel*, 214 F.3d 1285, 1288–89 (11th Cir. 2000). Section 201(d)(2)(A) declares that "blocked asset" *means* an asset frozen under select provisions of the Trading Act and the Economic Powers Act. Assets frozen under the Kingpin Act, however, are absent from that definition. The unavoidable conclusion is that "blocked assets" under the Terrorism Act does not mean assets frozen pursuant to the Kingpin Act.

Appellees argue that the Terrorism Act's legislative history and statutory purpose favor an expansive interpretation of "blocked assets."[9] According to Appellees, the Terrorism Act's legislative history demonstrates Congress intended to provide terrorism victims broadly-applicable and easily-obtained remedies. In the words of one legislator, "blocked asset" was defined "broadly . . . to include any asset of a terrorist party that has been seized or frozen by the United States in

---

[9] Appellees rely heavily on the Second Circuit's decision in *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010). *Weinstein*, however, is materially different from this case. In *Weinstein*, the plaintiffs were able to invoke § 201(a) because, unlike here, the defendant's assets were "blocked" pursuant to an Executive Order issued under the Economic Powers Act—a statute expressly enumerated in the definition of "blocked assets." *See Weinstein*, 609 F.3d at 46–48 n.1 (citing Executive Order No. 13382, Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, 70 Fed. Reg. 38567, 38567–58 (June 28, 2005)). Also, the defendant in *Weinstein* "concede[d] that it [wa]s an instrumentality" of the terrorist party against whom default judgment was entered. *Weinstein*, 609 F.3d at 48. *Weinstein*, however, did not answer the question posed in this case, which is whether assets not frozen under the Trading Act or the Economic Powers Act constitute "blocked assets" under § 201(d)(2).

accordance with law."  148 Cong. Rec. S11524, at S11528 (daily ed. Nov. 19,

2002) (statement of Sen. Harkin).

Legislative history does not change the clear, codified text of the Terrorism

Act.  *See, e.g.*, *United States v. Rush*, 874 F.2d 1513, 1514 (11th Cir. 1989).  When

statutory text is unambiguous, this Court must apply that language as written.

*Albernaz v. United States*, 450 U.S. 333, 336, 101 S. Ct. 1137, 1141 (1981).

Indeed, a statute's plain language controls unless it is "*inescapably* ambiguous."

*United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1998) (internal quotation

marks omitted) (emphasis added).  Because the definition of "blocked asset" is

unambiguous, the statute's legislative history may not be used to create an

ambiguity where none exists.  *See Rush*, 874 F.2d at 1514.[10]

Even if § 201(d)(2)(A)'s definition of "blocked assets" were ambiguous,

§ 201(d)(2)(B)(i) forecloses the possibility that Kingpin Act frozen assets come

within the definition of "blocked assets."  According to § 201(d)(2)(B)(i), "blocked

assets" do "*not* include property that is subject to a license issued by the United

States Government for final payment, transfer, or disposition . . . in connection

with a transaction for which the issuance of such license has been specifically

---

[10] Likewise, we are not persuaded by legislative history suggesting the Terrorism Act was designed "to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism."  148 Cong. Rec. at S11528.  Such history pertains only to *how* the statute was intended to apply, but it is unresponsive to the central question in this case, which is *whether* the statute applies to a particular judgment.

required by statute." Terrorism Act § 201(d)(2)(B)(i) (emphasis added).[11] The Kingpin Act, however, according to its text and accompanying regulations, requires the procurement of a government-issued license before private individuals may execute against assets frozen under the Act.[12] Thus, § 201(d)(2)(B)(i) further solidifies what the plain text of § 201(d)(2)(A) makes clear: assets frozen pursuant to the Kingpin Act are not "blocked assets" under the Terrorism Act.

Finally, Appellees argue in the alternative that, although the Kingpin Act is not expressly listed in § 201(d)(2)(A)'s definition, it should be treated as though it were the Economic Powers Act, which *is* expressly listed. Because the designation regimes specified in the two statutes are similar in some regards, Appellees contend the statutes are effectively identical, as entities "designated under the

---

[11] Section 201(d)(2)(B)(i) provides two explicit exemptions, one for the Economic Powers Act and the other for "the United Nations Participation Act of 1945 (22 U.S.C. § 287 et seq.)." Terrorism Act § 201(d)(2)(B)(i). Neither of those exemptions is relevant to this case.

[12] *See, e.g.*, 21 U.S.C. § 1904(c)(1) ("Except to the extent provided in regulations . . . [a]ny transaction . . . by a United States person . . . in property . . . of any significant foreign narcotics trafficker [is a prohibited transaction]."); 31 C.F.R. § 598.205(e) ("Unless licensed or authorized pursuant to this part, any . . . garnishment . . . is null and void with respect to any property in which . . . there existed an interest of a specially designated narcotics trafficker."); *see also* 31 C.F.R. § 598.301 ("The terms blocked account and blocked property [under the Kingpin Act] mean any account or property subject to [31 C.F.R.] § 598.202 . . . and with respect to which payments . . . or other dealings may not be made or effected except pursuant to an authorization or license from the Office of Foreign Assets Control authorizing such action."); *id.* § 598.502(b) ("No . . . license authorizes any transaction prohibited by this part unless the . . . license is issued by the Office of Foreign Assets Control and specifically refers to this part."); *id.* § 598.503 ("The Director of the Office of Foreign Assets Control reserves the right to exclude any person, property, or transaction from the operation of any license or from the privileges conferred by any license."); Reporting and Procedures Regulations, Foreign Narcotics Kingpin Sanctions Regulations, 65 Fed. Reg. 41334, 41335 (July 5, 2000) ("Transactions otherwise prohibited under this part but found to be consistent with U.S. policy may be authorized by a general license contained in [31 C.F.R. § 598.205(e)] . . . .").

10

Kingpin Act would . . . also satisfy the criteria for designation" under the Economic Powers Act. *Compare* 31 C.F.R. § 536.312 (listing the designation criteria for the Economic Powers Act), *with* 31 C.F.R. § 598.314 (listing the designation criteria for the Kingpin Act).

Similarities between laws, however, do not make them the same law. The Kingpin Act is not the Economic Powers Act. Nor is it, for that matter, the Trading Act. Expanding § 201(d)(2)(A) beyond its unambiguous terms is an action only Congress may take. Because this Court's inquiry focuses only on what the statute clearly expresses, the Kingpin Act cannot be treated as though it were the Economic Powers Act.

## IV. CONCLUSION

The district court erred in concluding assets frozen pursuant to the Kingpin Act constitute "blocked assets" under the Terrorism Act. As the plain language of § 201(d)(2)(A) states, the Terrorism Act defines "blocked assets" to cover only those assets frozen under specified sections of the Trading Act and the Economic Powers Act. Mercurio's assets were frozen under neither of those statutes. Thus, the district court's judgment in favor of Appellees relied on an erroneous interpretation of the Terrorism Act. We reverse and remand the district court's order granting a writ of garnishment in favor of Appellees.

**REVERSED** and **REMANDED.**

11